[No. 52568–4.   En Banc.   February 26, 1987.]

JULIA G. HAMILTON, *Individually and as Personal Representative,* ET AL, *Appellants,* v. FARMERS INSURANCE COMPANY OF WASHINGTON, *Respondent.*

*Garvey, Schubert, Adams & Barer,* by *David R. West,* for appellants.

*Larry B. Alexander,* for respondent.

DORE, J.—This action was brought to establish underinsured motorist coverage. We hold that the underinsurer's potential subrogation rights were not prejudiced by the insured's settlement with and release of the tortfeasor, even given the possibility that the tortfeasor had assets other than his liability insurance proceeds. We reverse the trial court's grant of summary judgment for the underinsurer, and remand the case with instructions that the parties proceed with arbitration to determine the amount by which

the insured's damages exceed the liability insurance limits of the tortfeasor. The underinsurer is liable for the insured's uncompensated damages above those limits until the underinsurance policy coverage is exhausted or until the insured is fully compensated, whichever occurs first.

## FACTS

This action arose out of an automobile collision which killed Ronald Hamilton, Jr., the husband of Julia Hamilton and the father of the other four appellants. On June 17, 1983, Mr. Hamilton was driving his Ford Pinto westbound in the outside lane of I-90 when Marc G. Desmarais, who was driving a Freightliner truck in the inside lane, negligently changed lanes and struck the left rear of the Pinto. The impact resulted in the death of Hamilton.

Subsequent investigation revealed that Desmarais was driving the Freightliner within the scope and course of his employment with James R. and Glenda S. DeCoto, d/b/a DeCoto Cattle Company, making the DeCotos vicariously liable for Desmarais' negligence.

The Hamiltons' attorneys assessed the value of the Hamiltons' wrongful death claim at $1.2 to $1.5 million. That assessment included economic losses in excess of $600,000. Based on these facts, the Hamiltons made a $1.5 million settlement demand on Desmarais and the DeCotos.

The Hamiltons' attorneys also investigated the possible sources of recovery of the Hamiltons' damages. They found that Desmarais had neither insurance nor recoverable assets. The DeCotos had $500,000 of liability insurance, as required by WAC 480-12-350, with Early American Insurance. The Hamiltons' attorneys determined that the net value of the DeCotos' other assets was approximately $13,600. This appraisal was based on a financial statement supplied by the DeCotos and a report by an independent investigator who corroborated this information.

In March of 1984, the Hamiltons discovered that they carried $100,000 in underinsured motorist coverage with Farmers Insurance. Because the Hamiltons' estimations of

their damages exceeded the limits of all other applicable insurance, the Hamiltons made demand on Farmers for payment under the underinsured motorist coverage. This demand, made on March 30, 1984, included a copy of the economist's report estimating economic damages alone at over $600,000.

At the request of Farmers, the Hamiltons' attorneys provided additional information establishing the liability of Desmarais and the DeCotos and the amount of the Hamiltons' damages. After further negotiations, Farmers indicated that the Hamiltons had a right to arbitrate their underinsured motorist coverage claim.

In the meantime, the Hamiltons filed suit against Desmarais and DeCotos after negotiations with the DeCotos' insurer, Early American Insurance Company, failed to produce a settlement. The Hamiltons' counsel began negotiating with Early American for the remaining available policy limits of the Early American policy, then about $491,036.50.[1]

The Hamiltons notified Farmers of these negotiations on August 15, 1984, and asked Farmers to confirm that settlement for the remaining available policy limits would not prejudice the Hamiltons' rights under the underinsured motorist coverage. Farmers responded by instructing the Hamiltons not to settle their claim until Farmers could investigate the assets of DeCotos and Desmarais.

On August 30, 1984 Early American offered to pay its policy limits to the Hamiltons in exchange for a complete release of all claims against Desmarais and DeCotos.

On September 5, 1984, Farmers informed the Hamiltons' counsel that Farmers would not consent to any settlement which would prejudice Farmers' purported right of subrogation against the DeCotos' assets. Farmers would treat the Hamiltons as having breached their contract with Farmers

---

[1] The available limits under the Early American policy were reduced by approximately $9,000 due to other payments arising out of the June 17, 1983 collision.

if they executed such a settlement.

The Hamiltons' counsel then attempted to arrange a settlement by which the Hamiltons would obtain the proceeds of the Early American policy, but would protect Farmers' purported subrogation rights. Early American's counsel refused to agree to any settlement that did not completely discharge the defendants.

The Hamiltons made one final attempt to persuade Farmers to consent to the proposed settlement. Farmers once again refused to consent to the settlement and reiterated its position that the Hamiltons would be in breach of contract by settling with the tortfeasors for the entire policy limits of the DeCotos' insurance.

In order to obtain a prompt and certain recovery, and to avoid the uncertainty, delay and expense of continued litigation, the Hamiltons accepted the tortfeasors' insurer's settlement offer. The Hamiltons received the proceeds of the Early American policy, less legal fees, and fully released the DeCotos and Desmarais. Because Farmers continued to refuse to process the Hamiltons' underinsured motorist claim, the Hamiltons initiated this action. The Hamiltons sought a declaratory ruling that they were entitled to underinsured motorist coverage to the extent they could show their right to recover exceeded the amount of the tortfeasors' liability insurance. The Hamiltons also sought damages in the full amount of the policy, treble damages for Farmers' alleged violation of the Consumer Protection Act, RCW 19.86, attorneys' fees and costs. Farmers denied liability.

The Hamiltons moved for partial summary judgment on the issues of coverage and Farmers' liability. After reviewing the materials submitted by both parties and hearing oral argument, the trial court ruled: (1) that Farmers had valid subrogation rights under Washington law; (2) that the Hamiltons had prejudiced those rights by settling for the full amount of the tortfeasors' insurance and releasing the underinsured tortfeasors; and (3) that the Hamiltons had therefore not demonstrated their right to the relief

requested. Because no material issue of fact existed the trial court entered an order denying the Hamiltons' motion for summary judgment and dismissing their action with prejudice.

## SUBROGATION AND UNDERINSURED MOTORIST COVERAGE

Underinsured motorist coverage must be included in each liability insurance policy unless rejected by the insured. RCW 48.22.030(2). The underinsured motorist coverage statute expressly requires underinsured motorist coverage to apply whenever a tortfeasor's insurance coverage is insufficient to compensate the victim for all damages suffered:

> *No new policy or renewal of an existing policy insuring against loss* resulting from liability imposed by law for bodily injury, death, or property damage, suffered by any person arising out of the ownership, maintenance, or use of a motor vehicle *shall be issued with respect to any motor vehicle* registered or principally garaged in this state *unless coverage is provided therein . . . for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of underinsured motor vehicles . . .*

(Italics ours.) RCW 48.22.030(2) in part. An "[u]nderinsured motor vehicle" is defined as a vehicle with insufficient insurance to compensate the plaintiff's damages:

> "Underinsured motor vehicle" means a motor vehicle with respect to the ownership, maintenance, or use of which either no bodily injury or property damage liability bond or insurance policy applies at the time of an accident, or with respect to which the *sum of the limits of liability under all* bodily injury or property damage liability bonds and *insurance policies* applicable to a covered person after an accident *is less than the applicable damages which the covered person is legally entitled to recover.*

(Italics ours.) RCW 48.22.030(1).

Under these provisions there are two conditions to underinsured motorist coverage: (1) the "covered person"

must be legally entitled to recover damages; and (2) damages must exceed the limits of liability under all other applicable insurance policies.

■ We have construed the purpose of the underinsured motorist statute

> as allowing an injured party to recover those damages which the injured party would have received had the responsible party been insured with liability limits as broad as the injured party's statutorily mandated underinsured motorist coverage limits. This also means that where the underinsured motorist endorsement does not provide protection to the extent mandated by the underinsured motorist statute, the offending portion of the policy is void and unenforceable. In other words, the Legislature has mandated a certain amount and kind of coverage; the insurer cannot avoid that obligation by a policy clause which has not been authorized by the Legislature.

(Footnotes omitted.) *Britton v. Safeco Ins. Co. of Am.*, 104 Wn.2d 518, 531, 707 P.2d 125 (1985). The intent of the statute is to provide full compensation to the injured insured under an underinsured motorist policy. The injured insured is entitled to compensation from his underinsurer without regard to any recovery obtained from other sources and without regard to whether such recovery exhausts any coverage provided by the liability insurers of the tortfeasor, until the injured insured's underinsurance policy limits are reached or he is fully compensated for his damages, whichever occurs first. *Elovich v. Nationwide Ins. Co.*, 104 Wn.2d 543, 550–52, 707 P.2d 1319 (1985).

Whether the injured insured obtains full recovery of the tortfeasor's liability insurance limits is irrelevant to the determination of underinsurance payments. Underinsured motorist coverage allows the injured insured to recover payment from the underinsurer when the "sum of the limits of liability under all . . . insurance policies . . . is less than the applicable damages which the covered person is legally entitled to recover." RCW 48.22.030(1). The effect of this provision was correctly stated in a recent opinion of the

Attorney General:

> If an injured insured settles his claim with the tort-feasor's liability insurer for less than the policy limits, the "underinsured motorist" carrier is entitled to compute its payments to the injured insured as though the policy limits had been paid.

AGO 13 (1981), at 19. *See also* Comment, *Washington's Underinsured Motorist Statute: Balancing the Interests of Insurers and Insureds,* 55 Wash. L. Rev. 819, 830 n.55 & accompanying text (1980). In other words, the underinsurer always is allowed to credit the full amount of the tortfeasor's liability coverage against the insured's damages.

We have recently held that the purpose and intent of this statutory scheme prohibits policy provisions which attempt to limit the insured's right to full compensation. In *Britton,* we held that an underinsured motorist policy provision providing for a setoff against coverage for disability benefits payable to the insured is void. Unless expressly authorized by statute, policy provisions reducing underinsured motorist benefits below the coverage mandated by the statute are against public policy and void. *Britton,* at 531. In *Elovich,* we held that a provision within an underinsured motorist policy which requires consent of the insurer before an injured insured may settle with a tortfeasor is contrary to public policy and is void. Again, we stated that an underinsurer's attempts to limit contractually the insured's right to recover when his damages exceed the limits of the tortfeasor's liability insurance are void as against public policy. *Elovich,* at 552–53.

Despite these pronouncements that an underinsurer cannot limit the statutorily mandated coverage, Farmers nonetheless contends it was prejudiced by the Hamiltons' settlement and release because it lost subrogation rights against other assets of the tortfeasor. Although Farmers concedes that it cannot interfere with a settlement between its insured and the tortfeasor, it contends that it should be entitled to offset its payment to the insured by the amount of available assets of the tortfeasor which are shielded from

recovery by the release.

As previously stated, the underinsurer cannot avoid the statutorily mandated coverage by a policy provision which has not been authorized by the Legislature. *Britton,* at 531. The Legislature has provided the insurer a right of reimbursement.

> In the event of payment to an insured under the coverage required by this chapter and subject to the terms and conditions of such coverage, the insurer making such payment shall, to the extent thereof, be entitled to the proceeds of any settlement or judgment resulting from the exercise of any rights of recovery of such insured against any person or organization legally responsible for the bodily injury, death, or property damage for which such payment is made . . .

RCW 48.22.040(3), in part. The reimbursement provision does not address subrogation rights, but provides an insurer a right of reimbursement of its payments from any excess recovery of the insured resulting from a settlement or judgment.

The Attorney General concluded in AGO 13 (1981), cited with approval in *Elovich,* that this statutory right of reimbursement and the policy of fully compensating the injured insured prohibits an underinsurer from including a subrogation clause in its policy:

> An insurer who has made a payment under "underinsured motorist" coverage does have a statutory right of reimbursement from any judgment or settlement which its injured insured collects from the tortfeasor directly, but is not authorized by statute to include a subrogation clause in an "underinsured motorist" endorsement, and may not include a "consent to settle" clause in such endorsement.

AGO 13, at 19. In reaching this conclusion, with which we agree, the Attorney General found guidance in the analysis of the Supreme Court of Louisiana in *Niemann v. Travelers Ins. Co.,* 368 So. 2d 1003 (La. 1979).[2] We likewise have held that it is appropriate to look to Louisiana law in

---

[2]The *Niemann* opinion also was relied upon by this court in *Elovich.*

interpreting our underinsured motorist statute.

To determine the intent of our legislation we are guided by the reasoning of the Louisiana State Supreme Court, the only court to interpret a statute which in all pertinent respects is identical to ours.

*Millers Cas. Ins. Co. v. Briggs,* 100 Wn.2d 1, 5, 665 P.2d 891 (1983).

The facts of *Niemann* are similar to those in the present case. The plaintiff there suffered damages in excess of $10,000. The plaintiff compromised his claim for $9,750, $250 less than the $10,000 policy limits of the tortfeasor's insurance, and completely released the tortfeasor. The plaintiff then sought underinsured motorist coverage benefits because his damages exceeded the limits of all other available insurance. The insurer contended that the plaintiff had waived his underinsured motorist coverage rights by settling and prejudicing the insurer's subrogation rights. The Louisiana Supreme Court rejected the insurer's argument, held that the insurer had no subrogation rights, and held the consent to settle clause unenforceable.

The court initially noted that no provision of the underinsured motorist statute grants the insurer a right to subrogation. Rather, the statute affords only limited rights of reimbursement. *Niemann,* at 1006. The court then addressed whether the enforcement of contractual subrogation rights would serve to block the statutorily mandated underinsured motorist coverage.

First, the court noted that the practical ramifications of underinsured motorist coverage require the plaintiff to release the tortfeasor:

Because the liability insurer is obligated under the liability insurance policy to defend its insured and will not as a practical matter settle without securing a release of the insured, plaintiff [the insured] is compelled by a legitimate and non–fraudulent need to release the tortfeasor and his insurer.

*Niemann,* at 1007. Second, the court noted that the underinsured motorist coverage carrier should not have the right

to interfere with the insured's settlement:

> If we presuppose that by the statute it was intended that defendant have subrogation rights, or rights greater than afforded by [the reimbursement provisions] our result in this case seems harsh. On the other hand there are equally compelling reasons of public policy to resist a broad interpretation of [the reimbursement provisions] which would allow the insurer to incorporate in his policy subrogation and consent to settle clauses. Why should the insurer, mandated by statute to afford UM coverage and receiving a premium for exposure over liability limits of the underinsured motorist, have the right to interfere with its insured's settlement with a liability carrier within policy limits, and that carrier's insured?

*Niemann,* at 1007. Finally, the court explained that subrogation and consent to settle clauses serve no authorized purpose, but merely restrict statutorily mandated coverage:

> The policy's subrogation clause, and the consent to settle clause which protects that *purported* right of subrogation, serve no legally authorized purpose. They simply impede the insured's assertion of that part of his damage claim (against the tortfeasor's liability insurer) which the carrier in writing underinsured motorist coverage effectively acknowledged would be an independent or supplemental right of recovery of its insured. And assuming the insured is compelled, in the interest of securing sure and early settlement with the tortfeasor's liability insurer, to settle without the UM carrier's consent (a consent which may be arbitrarily withheld if full import is afforded the clause), the consent to settle clause serves as a bar to the UM coverage mandated by statute.

*Niemann,* at 1007–08.

As the foregoing makes clear, subrogation rights cannot be engrafted onto the statutory scheme when they would thwart the purpose of fully compensating the injured insured. Stated in another fashion in *Jilek v. Covert,* 465 So. 2d 102 (La. Ct. App. 1985), subrogation can do no more than place the underinsurer into the position of the insured. Where the injured insured has released the tortfeasor, the underinsurer's subrogation upon payment will not enable it to recover the insured's claim against the

tortfeasor, nor are any rights prejudiced which would permit a reduction in compensation to the insured.

██ This reasoning was further explained in *Bond v. Commercial Union Assur. Co.,* 407 So. 2d 401 (La. 1981), which holds that, *absent a release* of the tortfeasor, the underinsurer who makes payment for a portion of the injured insured's damages receives a partial, subordinate right of subrogation so that the injured insured has a preference over the underinsurer to collect the remainder of his damages from the tortfeasor. The underinsurer collects from the tortfeasor only after the injured has been fully compensated. Thus, any recovery against the tortfeasor must be used first to compensate the injured insured for any remaining damages.

This analysis comports with our underinsured motorist statute, the purpose of which is to allow the injured insured to recover those damages which he would have received had the tortfeasor been insured with liability limits as broad as the injured insured's underinsured motorist coverage limits. The underinsurer has received a premium to assume the risk that its insured will suffer damages in excess of the tortfeasor's insurance coverage. The Legislature has not provided for subrogation rights that would reduce the statutorily mandated coverage, but has *only granted a right of reimbursement* from the insured when a settlement or judgment results in an excess recovery. Equitable or contractual subrogation rights cannot be engrafted onto the statutory scheme to thwart its intended purpose.

This rationale is further supported by the opinion of the Supreme Court of Minnesota in *Schmidt v. Clothier,* 338 N.W.2d 256 (Minn. 1983).[3] In that case, an underinsurer argued that the insured's settlement and release destroyed the underinsurer's subrogation rights and thus precluded recovery of underinsured benefits. The court disagreed. The

---

[3]The resolution of this decision was governed by the Minnesota underinsured motorist statute which provided for coverage for damages in excess of the limits of the tortfeasor's liability insurance. *Schmidt,* at 261.

court first noted that the statutory scheme only recognized a limited right of subrogation arising only after underinsurance benefits have been paid to the insured. If the tortfeasor is released prior to payment by the underinsurer no subrogation rights ever arise. *Schmidt,* at 261–62. The underinsurer nonetheless argued that it should not be denied its equitable subrogation rights to pursue the assets of the tortfeasor. The court responded as follows:

Between these two parties, the equities balance in favor of the underinsurer. The underinsurer, however, *will have this subrogation right against the tortfeasor only if it has paid underinsurance benefits prior to release of the tortfeasor.* Thus, the underinsurer is entitled to notice of the tentative settlement and an opportunity to protect those potential rights by paying underinsurance benefits before release. The district court in each of the cases before us provided just this opportunity. Under the procedure set out in those orders, the underinsurer was given notice of the tentative settlement agreement and a period of time in which to assess the case. In that time it could evaluate relevant factors, such as the amount of the settlement, the amount of liability insurance remaining, if any, the amount of assets held by the tortfeasor and the likelihood of their recovery via subrogation, the total amount of the insured's damages, and the expenses and risks of litigating the insured's cause of action. If the underinsurer were to determine after assessment that recovery of underinsurance benefits it paid was unlikely (e.g., where the liability limits are exhausted or nearly so and the tortfeasor is judgment–proof), it could simply let the "grace period" expire and permit the settlement and release. It must, of course, thereafter process the underinsurance claim but would not be able to recover those payments through subrogation.

If, on the other hand, damages were substantially more than the liability limits and the tortfeasor had substantial assets, *the underinsurer could substitute its payment to the insured in an amount equal to the tentative settlement.* In this situation, the underinsurer's payment would protect its subrogation rights to the extent of the payment, and the insured would receive the amount of the settlement offer in cash. The underinsurer would then have to arbitrate the underinsured claim and could,

thereafter, attempt to negotiate a better settlement or could proceed to trial in the insured's name.

(Citations omitted. Italics ours.) *Schmidt,* at 263.

Under the foregoing interpretation of settlement rights of the injured insured, an underinsurer who seeks recovery from the tortfeasor has a ready means of doing so. The underinsurer can succeed to the rights of its insured against the tortfeasor by (1) paying the underinsurance benefits prior to release of the tortfeasor and (2) substituting a payment to the insured in an amount equal to the tentative settlement. These payments assure that the injured insured receives the full benefit of the proposed settlement and his underinsurance coverage. The underinsurer then can pursue the insured's rights against the tortfeasor and attempt to recover assets in addition to the settlement offer. Any recovery over the amount of the substituted settlement payment must be applied first to any uncompensated damages of the injured insured. Only after the insured's damages are fully compensated can the underinsurer retain any recovery. Thus, if the underinsurer determines that the tortfeasor has available assets which would reduce its underinsurance payments after full compensation of the insured's damages, it may secure its subrogation rights by substituting a payment to the insured in an amount equal to the settlement offer.

Application of the foregoing analysis to the present case establishes that Farmers did *not* have rights of subrogation that were prejudiced by the Hamiltons' release of the tortfeasor. Farmers was notified of the settlement offer and had well over a month in which to assess the case. Instead of tendering the underinsurance coverage and substituting a payment for the settlement offer, Farmers simply maintained that a settlement without consent would exclude all underinsurance coverage. The Hamiltons obtained full recovery of the tortfeasor's liability insurance proceeds and are entitled to payment from the underinsured motorist coverage up to the amount of their damages, but not more than the policy limits.

## CONCLUSION

Underinsured motorist coverage is applicable to all compensable damages in excess of the tortfeasor's liability insurance limits. The statutory aim of fully compensating the insured cannot be defeated by offsetting underinsurance coverage by tortfeasor assets that have not been received by the insured. A settlement for the full amount of liability insurance proceeds and release of the tortfeasor does not prejudice any subrogation rights of the underinsurer. The underinsurer may secure subrogation rights against additional assets of the tortfeasor by avoiding the settlement with prompt payment of underinsurance benefits and a substituted payment to the insured. Any recovery against the tortfeasor over the amount of the substituted settlement payment must be applied first to any uncompensated damages of the injured insured. Only after the insured is fully compensated can the underinsurer retain any excess recovery.

We reverse the judgment of the trial court and remand for further proceedings to be conducted in accordance with the provisions of this opinion.

PEARSON, C.J., BRACHTENBACH, DOLLIVER, CALLOW, GOODLOE, and DURHAM, JJ., and HAMILTON, J. Pro Tem., concur.

ANDERSEN, J., concurs in the result.