I dissent because in many ways this case closely parallelsProgressive Specialty Insurance Co. v. Hammonds, 551 So.2d 333
(Ala. 1989). Although the posture of Progressive Specialty was somewhat different from that of this case, the facts ofProgressive Specialty bear a remarkable resemblance to those before us. The pertinent facts of Progressive Specialty are set forth below:
 "On January 19, 1987, Hammonds's automobile, in which James Scott Fuller was a passenger, collided with a second vehicle. As a result of that accident, Fuller sustained serious injuries and subsequently died. At the time of the accident, Hammonds carried automobile liability insurance with Alfa Mutual Insurance Company ('Alfa'); Hammonds's insurance had a $25,000 coverage limit for Fuller's injuries and death. Scott Fuller was covered by the underinsured motorist provisions of two policies of automobile insurance issued by Progressive to his father, James R. Fuller. *Page 354 
"James R. Fuller was appointed executor of his son's estate, and, in that capacity, he retained a lawyer in connection with the accident that killed his son. The lawyer, on March 5, 1987, wrote Reynolds Insurance Agency:
 " 'I represent James R. Fuller in connection with his claims arising out of the death of his minor son, Scott Fuller, on January 19, 1987. It is my understanding that the owner of the vehicle in which Scott was riding, the driver of which appears from the State Trooper report to have been at fault in connection with the accident, is insured by Alabama Farm Bureau Insurance Company with coverage of only $25,000.00.
 " 'My client has two insurance policies obtained through you in which Progressive Specialty Insurance Company of Cleveland, Ohio is the insurer. These policies provide for uninsured and underinsured motorist coverage in what appears to be total coverage of $80,000. Under these circumstances, it appears that there is the possibility of a substantial recovery against Progressive Specialty Insurance Company. I shall appreciate it if you will notify them of this claim and ask them to have someone contact me about it at an early date.'
"Progressive wrote the lawyer on March 17, 1987, stating that it had received the March 5 letter and that it was investigating the accident. The lawyer and Progressive continued a course of correspondence, with the lawyer writing Progressive on March 26, April 17, and May 21, and Progressive replying on April 6, April 24, and May 22, respectively. The lawyer repeatedly asked Progressive to make a decision either to deny or to pay the claim, and Progressive consistently replied that it was still investigating the claim, that a decision either to deny or to pay the claim would be reached 'in the very near future.'
"On June 9, 1987, nearly five months after the accident, James R. Fuller, as executor of his son's estate, executed a pro tanto release, releasing Hammonds from all liability for the injuries and death of his son in exchange for $25,000, the proceeds of the Alfa liability policy. The release stated that Fuller expressly reserved his right, as executor of his son's estate, to proceed against Progressive for the underinsured motorist benefits available under the policies issued by it.
"On June 10, 1987, Fuller's lawyer wrote Progressive again, informing it that Fuller had signed a pro tanto release of Hammonds and that Alfa had paid its $25,000 policy limit. Progressive responded on June 25 by writing a letter that once again promised 'to evaluate this claim in the very near future.' On June 29, Fuller filed an action against Progressive, seeking to recover the underinsured motorist benefits allegedly due him under his policies with Progressive.
"Progressive answered and filed a third-party complaint against Hammonds. Both Hammonds and Progressive filed motions for summary judgment. On June 7, 1988, the trial court entered summary judgment in favor of Hammonds on Progressive's third-party claim, stating as follows, in pertinent part:
 " '. . . The Court finds that Progressive Specialty Insurance Company's right to subrogation is dependent ultimately upon the Third Party Defendant's liability to the Plaintiff. Since the liability of the Third Party Defendant, Ellis Monroe Hammonds, has been released by the Plaintiff the claim alleged in the Third Party Complaint is thereby lost.
 " 'At the time of the execution of the pro tanto release, the Plaintiff owned all the cause of action as to the tort-feasor, Ellis Monroe Hammonds, and no subrogation claim existed. By releasing the tort-feasor, Ellis Monroe Hammonds, from any and all claims, the plaintiff has effectively destroyed Progressive Specialty Insurance Company's right to subrogation from Ellis Monroe Hammonds. *Page 355 
" '. . . .
 " 'Based on the Findings of Fact stated hereinabove and the Conclusions of Law, the . . . Motion of the Third Party Defendant, Ellis Monroe Hammonds, for a summary judgment . . . is hereby granted.
 " 'It is further ORDERED, ADJUDGED AND DECREED by this Court that there is no just reason for delay, and it is directed that this . . . summary judgment in favor of the Third Party Defendant, Ellis Monroe Hammonds, be entered as a final judgment under the provisions of Rule 54(b), Alabama Rules of Civil Procedure.'
". . . .
"Progressive argues that, because it allegedly did not know that Fuller was executing the release before he executed it, the trial court erred when it held that the release executed by Fuller destroyed its subrogation rights. In both Hardy v.Progressive Insurance Co., 531 So.2d 885 (Ala. 1988), andAuto-Owners Insurance Co. v. Hudson, 547 So.2d 467 (Ala. 1989), the Court has recently addressed an insurer's subrogation rights in relation to an insured's claim for underinsured motorist benefits.
"In Hardy, we reversed a summary judgment for Progressive Insurance Company on Hardy's claim for underinsured motorist benefits. Mr. Wonderful Brown's automobile struck the automobile driven by Hardy and seriously injured her. Brown's insurer, United States Fidelity and Guaranty Company, settled with Hardy. Hardy then filed an action against Progressive, alleging that at the time of the accident she had in force a policy of insurance issued by Progressive that provided underinsured motorist coverage and alleging that Brown was an underinsured motorist. The trial court granted Progressive's motion for summary judgment, and we reversed, because the record did not contain any documentation to support the trial court's judgment. In making that holding, the Court stated:
 " 'Some insurance companies have renounced their rights of subrogation for underinsured motorist coverage by provisions within the policies. See, i.e., Silvers v. Horace Mann Ins. Co., 90 N.C. App. 1, 367 S.E.2d 372 (1988); and Branch v. Travelers Indem. Co., 90 N.C. App. 116, 367 S.E.2d 369
(1988). When this has not been done, some courts have fashioned a procedure to release an insured victim from the twilight zone that he is placed in between underinsured coverage and an insurer's right to subrogation. Schmidt v. Clothier, 338 N.W.2d 256 (Minn. 1983); Vogt v. Schroeder, 129 Wis.2d 3, 383 N.W.2d 876 (1986); Hamilton v. Farmers Ins. Co. of Washington, 107 Wn.2d 721, 733 P.2d 213 (1987).'
Hardy, supra, at 887.
"The opinion further stated:
 " 'In Progressive Cas. Ins. Co. v. Kraayenbrink, 370 N.W.2d 455 (Minn.Ct.App. 1985), the Minnesota Court of Appeals, in holding that an insured's release of an underinsured tort-feasor did not preclude the insured from recovering underinsurance benefits for uncompensated injuries from his insurer, Progressive, despite the destruction of Progressive's subrogation rights, wrote:
 " ' "The general rule is that a settlement and release of an underinsured tortfeasor will not automatically preclude recovery of underinsured benefits. Schmidt v. Clothier, 338 N.W.2d 256, 262
(Minn. 1983). When an insured party has given his underinsurance carrier notice of a tentative settlement prior to release, and the insurance carrier has the opportunity to protect its subrogation rights by paying the underinsurance benefits before the release, the release will not preclude recovery of underinsurance benefits. Schmidt, 338 N.W.2d at 263. If the tortfeasor is released before the insurance carrier makes payment to its insured, however, subrogation rights do not arise."
" '370 N.W.2d at 460.'
Hardy, 531 So.2d at 887-88. *Page 356 
"In Auto-Owners Insurance Co. v. Hudson, supra, this Court created a procedure for an insured victim to deal with whatHardy described as the 'twilight zone that [the insured victim] is placed in between underinsured coverage and an insurer's right to subrogation.' 531 So.2d at 887. The plaintiff inAuto-Owners, Hudson, was involved in an automobile accident with Otis Finklea, an employee of Phillips Feed Mill. Finklea's employer's insurance covered only $50,000 of damages in relation to the accident, and Hudson had suffered injuries in the amount of at least $70,000. Hudson notified his underinsured motorist insurance carrier, Auto-Owners, that he was negotiating a settlement agreement with Finklea's insurance company and that he intended to settle with Finklea for the $50,000 maximum coverage limit. Auto-Owners wrote a letter to Hudson, threatening that if Hudson signed a release of Finklea, then he would lose his right to the underinsurance coverage. Hudson, nevertheless, executed the release, which purported to reserve Hudson's claims against Auto-Owners. Hudson then filed an action for a judgment declaring that he was entitled to underinsured motorist benefits from Auto-Owners. The trial court awarded Hudson $20,000, and we affirmed the judgment. In affirming that judgment, this Court held:
 " 'When the tort-feasor's liability insurer has offered to pay the maximum of its liability limits, and it is undisputed that the damages exceed that amount and, further, exceed the amount of underinsured coverage available, the insured should give its underinsured motorist insurance carrier notice of this offered settlement and the underinsured motorist carrier should consent to the settlement and forgo any right of subrogation for any underinsured motorist coverage it may subsequently pay, or else pay to its insured the amount offered by the tortfeasor's insurer and preserve its right of subrogation.'
Auto-Owners, 547 So.2d at 469.
 "The holding quoted above from Auto-Owners applies in this case, because the cases are similar factually; accordingly, we consider Progressive's argument in light of Auto-Owners, though Auto-Owners had not been decided at the time of the trial court' ruling. It is undisputed both that Hammonds's insurance carrier offered to pay and indeed, did pay, its maximum liability limits and that Fuller's damages exceeded that amount. It is also undisputed that Progressive did not pay any money to Fuller. What we must determine is whether Fuller gave reasonable notice to Progressive of Hammonds's offer to settle, so that when Progressive would not pay Fuller and Fuller executed the release, Progressive's subrogation rights were destroyed.
 "Though Progressive argues it did not have such notice, the record is without documentation to support this argument. On the other hand, the record does provide some evidence that Progressive did have notice. The March 5 letter written by Fuller's lawyer clearly states that Hammonds was insured by Alfa for only $25,000. The course of correspondence between Fuller's lawyer and Progressive, from March 5, 1987, through June 1987, indicates that Progressive knew Fuller intended to pursue his claims. After three months of correspondence with Progressive and nearly five months after the accident, Fuller finally signed Hammonds's release. Considering this evidence and considering that the record contains no evidence that Progressive did not have notice, we hold that Progressive had reasonable notice of Fuller's intent to settle with Hammonds and that Progressive had reasonable time to respond to Fuller's actions.
Progressive's only response to Fuller was to send letters that repeatedly, over several months, promised to make a decision on Fuller's claim 'in the near future.' Progressive did not act reasonably in safeguarding its subrogation rights, and, because Fuller released Hammonds before Progressive acted to protect its subrogation rights, Progressive's subrogation rights *Page 357 
were destroyed. Auto-Owners, supra; Hardy, supra, at 888."
Progressive Specialty Insurance Co. v. Hammonds, 551 So.2d 333,334-37 (Ala. 1989), (emphasis added) (footnotes omitted). This Court stated that "[t]he course of correspondence between [the insured's] lawyer and Progressive, from March 5, 1987, through June 1987, indicates that Progressive knew [the insured] intended to pursue his claims [for underinsured motorist benefits]." 551 So.2d at 337. In the present case, as inProgressive, there was a "course of correspondence" between Beavers and Allstate regarding the possibility of an underinsured benefits claim. Clearly Allstate was placed on notice that should the tort-feasor's insurance be inadequate, there would be a claim for underinsured benefits and that Beavers would pursue that claim. From April to July, Beavers's letters to Allstate more or less updated Allstate as to the status of Beavers's claim. For example, in his April 17 letter, Beavers's attorney stated:
 "Please be advised that based upon Mr. Beavers' injuries, I believe this could possibly be a case of underinsured coverage. I will keep you advised as the matter progresses. If you have any questions, please call me."
Beavers's May 9 letter to Allstate said, "If it in fact develops that there is an uninsured motorist claim, I will look forward to working with you." On July 24, 1990, Beavers wrote Allstate as follows:
 "We have not settled with Alfa in the Beavers matter. The medicals are very significant, and the medical treatment is ongoing. Just as soon as I can get a handle on the total medicals, I will be in touch with you. Thanks for your cooperation."
The final letter to Allstate, dated July 30, 1990, stated:
 "I am enclosing for your consideration copies of the itemized bills that I have forwarded to Phillip Troha who is the insurance carrier for the tort-feasor in this case, as well as copy of my demand letter to him.
 "I, of course, have no way of knowing what the limits of coverage are for Mr. Troha's insured, but I would assume that unless it is a very unusual Alfa policy this is going to be a case of underinsured motorist coverage.
 "I would appreciate your reviewing these records with that thought in mind. If you have any question please call me."
Beavers's letters to Allstate indicate that, although he assumed there would be a claim for underinsured coverage, the facts and figures were not at his disposal to make that determination for certain. Nevertheless, enclosed with the July 30 letter was a copy of the demand letter to Phillip Troha of Alfa Insurance Company, the tortfeasor's insurer. That letter stated as follows:
 "I am enclosing itemized medicals in the amount of $21,558.57 on Mr. Donald Beavers.
 "I am also enclosing a discharge summary and a narrative report from Dr. Jeffrey Hawkins, and a narrative report from Dr. Edward C. Tyndal.
 "I would appreciate your reviewing these records and you may consider this my demand for settlement on behalf of Mr. Beavers in the amount of Two Hundred Fifty Thousand Dollars ($250,000). This demand is good for a period of ten (10) days.
 "I would appreciate your prompt response. I look forward to working with you, as always."
Clearly, upon receipt of a copy of the demand letter to Alfa, coupled with the other correspondence with Beavers, Allstate was put on notice that Beavers intended to pursue his claims against both Alfa and Allstate. The trial judge refused to enter a summary judgment in favor of Allstate because the judge felt that there was a jury question presented regarding whether Allstate had failed to investigate Beavers's claim within a reasonable time. The failure of Allstate to do so would have resulted in a waiver of its subrogation rights. From April to July, Allstate was aware of a possible claim, and yet Allstate relied solely on correspondence from Beavers's attorney *Page 358 
and did nothing to investigate the validity of Beavers's claim. Then, from July to December, when Beavers executed the release, Allstate did nothing whatever with regard to Beavers's claims. I conclude that such a failure to investigate, in light of the fact that Allstate was notified of a possible claim, presents a jury question as to whether Allstate acted reasonably. Therefore, I dissent.