[No. 15807-8-II; 16002-1-II. Division Two. August 8, 1994.]

DIXIE INSURANCE CO., *Appellant*, v. MARY MELLO, *Respondent*.

*Philip J. Welchman, Glen K. Ferguson,* and *Freise & Welchman,* for appellant.

*Stephen L. Bulzomi, John L. Messina,* and *Messina Bufalini Bulzomi,* for respondent.

ALEXANDER, J. — Dixie Insurance Company (Dixie) appeals a judgment of the Pierce County Superior Court against it and in favor of Mary Mello for $11,500. Dixie contends that the trial court erred in determining that Mello, a passenger in Shannon Berry's vehicle, was entitled to coverage under the uninsured/underinsured motorist (UIM) provisions of Berry's policy with Dixie, because, Dixie asserts, Mello failed to establish that an uninsured or underinsured vehicle was a cause of the accident. Dixie further contends that Mello is precluded or estopped from recovering under the policy, and that, even if Mello was covered, it was entitled to a greater offset than the trial court allowed. We reverse.

On January 20, 1985, Mary Mello was injured when a vehicle in which she was a passenger and Shannon Berry was the driver and owner was rearended by a car operated by Donald Lewis.[1] Immediately before the collision, Berry had attempted to move out of the left lane and into the left center lane as she was driving southbound on Interstate 5 near the Tacoma Dome. As she proceeded to change lanes, Berry suddenly observed another vehicle attempt to pull into the left center lane from the right center lane. The movement of the other vehicle caused Berry to swerve back into the far left lane. As she did so, her vehicle was struck in the rear by Lewis, who was behind her traveling southbound in the left lane.

Washington State Patrol Trooper McIvor arrived on the scene shortly after the accident. McIvor prepared an accident report based on statements given by the occupants of the Berry and Lewis vehicles. Unbeknownst to anyone who remained at the scene, Kelly Smith, a passenger in a car that had been traveling behind the vehicle that caused Berry to pull back into the left lane, saw the collision and recorded the license plate number of that vehicle. That same day, Smith telephoned the Washington State Patrol and

---

[1] As neither party has assigned error to or challenged any of the trial court's findings of fact, we treat them as verities on appeal. *Tomlinson v. Clarke*, 118 Wn.2d 498, 501, 825 P.2d 706 (1992). Our recitation of the facts is largely drawn from these unchallenged findings.

reported the number to Trooper McIvor. McIvor listed Smith on his report as an additional witness to the accident. McIvor also ran a check on the license plate number that had been reported by Smith. He determined that the car Smith had observed was registered in the State of Oregon to Patrick and Vivian Essien. McIvor listed this information in his notebook.

Mello did not conduct an investigation of her own following the accident. Neither did she contact Trooper McIvor, obtain a copy of the accident report, or make any effort to locate the operator or owner of the vehicle that Smith had observed.

On the date of the accident, the respective insurance coverage of the participants was as follows: Patrick and Vivian Essien were insured by Nationwide Insurance Company, with liability limits of $25,000 for a single injured claimant. Donald Lewis was insured by PEMCO Insurance Company (PEMCO) with liability limits of $50,000 for a single injured claimant. Shannon Berry was insured by Dixie, with bodily injury limits of $25,000 under the UIM provisions of her policy.

In February 1985, Berry and Lewis each filed property damage claims against Berry's policy with Dixie. Dixie apparently paid approximately $1,200 to these claimants, but it conducted no investigation of the accident at that time.[2]

Mello apparently filed a claim with Lewis's insurer, PEMCO, sometime in 1985. In the course of its investigation, a PEMCO representative contacted Trooper McIvor, but the record does not reveal what information, if any, McIvor gave to PEMCO. On October 7, 1985, a PEMCO representative informed Mello and Dixie that PEMCO denied liability for damages on the part of its insured, Lewis, contending that what it described as "a phantom vehicle" was entirely responsible for the accident.

---

[2]The trial court made no findings of fact about the resolution of the property damage claims by Berry and Lewis.

In November 1985, Mello hired an attorney to represent her in an effort to recover damages for the injuries she allegedly sustained in the accident. Her attorney made no independent investigation of the accident and made no effort to determine the identity of the owner or operator of the so-called "phantom" vehicle. Furthermore, Mello's attorney did not file suit against Lewis or the Essiens within 3 years of the date of the accident. See RCW 4.16.080(2).

On April 16, 1990, more than 5 years after the accident, an attorney at the firm that had been representing Mello informed her that the firm was withdrawing from her case. Mello then retained a new attorney, who soon demanded that Dixie submit to arbitration pursuant to the UIM provisions of Berry's policy, contending that Mello's injuries had been caused by a phantom vehicle. Dixie contacted Trooper McIvor as a part of its investigation, and quickly learned the identity of the owner of the alleged phantom vehicle.

On March 7, 1991, Dixie filed a declaratory judgment action in Pierce County Superior Court, seeking a declaration that Mello was not covered by Berry's policy because Mello had failed to establish that an uninsured or underinsured vehicle was involved in the accident, and, in any case, Mello was estopped or precluded from claiming coverage because she failed to bring suit against any alleged tortfeasor within the period of the statute of limitations, thus prejudicing Dixie's subrogation rights. Dixie moved for summary judgment. The trial court denied its motion.

In December 1991, an arbitration hearing was conducted. The arbitrators found that Mello's total damages were $15,000 and that the "phantom" driver was 75 percent at fault for these damages. The arbitrators found Lewis to be 25 percent at fault. Mello moved in Pierce County Superior Court to confirm the arbitrator's award. The trial court confirmed the award, but granted Dixie a 25 percent offset, reflecting the amount of damages caused through the fault of Lewis. Dixie appealed that decision.

Following the trial court's decision to confirm the arbitration award, a trial was held on the declaratory judgment

action relating to the question of coverage. The trial court concluded, after trial, that Mello was covered by the UIM provisions of Berry's policy, that she was not estopped or precluded from claiming that coverage, and that Dixie was entitled only to the aforementioned 25 percent offset from the arbitrators' award. Dixie also appealed this ruling. Its appeal was consolidated with Dixie's initial appeal.

I

■ Dixie contends that Mello was not entitled to UIM coverage under Berry's policy with it because she failed to establish that she was injured by an uninsured/underinsured motor vehicle. Insurance coverage depends on the language of an insurance policy, the interpretation of which is a question of law which is reviewed de novo. *Roller v. Stonewall Ins. Co.*, 115 Wn.2d 679, 682, 801 P.2d 207 (1990).

The UIM endorsement in Berry's policy with Dixie provides as follows:

[w]e will pay damages for bodily injury or property damage which an insured person is legally entitled to recover from the owner or operator of an underinsured motor vehicle . . ..

. . . .

(2) "Underinsured motor vehicle" means a land motor vehicle or trailer of any type: . . .

. . . .

(c) Which is a hit and run vehicle whose operator or owner cannot be identified and which hits or which causes an accident resulting in bodily injury or property damage without hitting:

. . . .

b. a vehicle which you or any relative are occupying; or

c. your insured car.

If there is no physical contact with the hit and run vehicle the facts of the accident must be proved. We will only accept competent evidence other than the testimony of a person making a claim under this coverage.

The endorsement provides the coverage mandated by RCW 48.22.030[3] which requires coverage for "protection of per-

---

[3]RCW 48.22.030(1) defines an "underinsured motor vehicle" as one with: respect to the ownership, maintenance, or use of which either no bodily injury or property damage liability bond or insurance policy applies at the time of an accident, or with respect to which the sum of the limits of liability under all

sons insured [under the policy] who are legally entitled to recover damages from owners or operators of underinsured motor vehicles, hit-and-run motor vehicles, and *phantom vehicles . . ..*" (Italics ours.) RCW 48.22.030(2). Although the Dixie policy does not explicitly use the term "phantom" vehicle, its expansive definition in the UIM endorsement of the term "hit and run" vehicle, in our judgment, includes phantom vehicles, *i.e.*, those that cause an accident without making contact with the covered vehicle, as well as those that make contact with the covered vehicle.[4] Thus, our inquiry in this case is whether Mello was entitled to UIM coverage because she was injured in an accident caused at least in part by a purported "phantom" vehicle.

## A

■■ We begin our analysis by denominating two important policies underlying UIM coverage in Washington. First, the UIM statute is designed to "allow[] an injured party to recover those damages which the injured party would have received had the responsible party been insured with liability limits as broad as the injured party's statutorily mandated underinsured motorist coverage limits." *Hamilton v. Farmers Ins. Co.*, 107 Wn.2d 721, 727, 733 P.2d 213 (1987) (quoting *Britton v. Safeco Ins. Co. of Am.*, 104 Wn.2d 518, 531, 707 P.2d 125 (1985)). In other words, UIM coverage ensures "full compensation for those injured in automobile accidents." *Allstate Ins. Co. v. Dejbod*, 63 Wn. App. 278, 281, 818 P.2d 608 (1991). The second critical policy underlying UIM coverage is that "liability insurance is primary, while UIM insurance is secondary." *Dejbod*, at 283-84; *Tissell v. Liberty Mut. Ins. Co.*, 115 Wn.2d 107, 120, 795 P.2d 126 (1990) (Callow, C.J., concurring); *Blackburn v. Safeco Ins.*

bodily injury or property damage liability bonds and insurance policies applicable to a covered person after an accident is less than the applicable damages which the covered person is legally entitled to recover."

[4]A phantom vehicle is defined as "a motor vehicle which causes bodily injury, death, or property damage to an insured and has no physical contact with the insured or the vehicle which the insured is occupying at the time of the accident . . .". RCW 48.22.030(8).

*Co.*, 115 Wn.2d 82, 88, 794 P.2d 1259 (1990). These two, sometimes competing, policies underlie our analysis of whether there is UIM coverage here.

## B

Before one establishes coverage under the UIM provisions of an insurance policy, it is essential that the at-fault motorist be shown to be uninsured or underinsured. 8C John A. Appleman, *Insurance* § 5087, at 318-20 (1981). The issue here is whether Mello established that her injuries were due to the fault of an uninsured/underinsured motor vehicle, of which a phantom vehicle is one type. If she did, then Mello is entitled to coverage under the UIM provisions of the Dixie policy.

In order to resolve this question, we must address a question that has heretofore not been addressed directly in Washington: Who has the burden of proof to demonstrate a lack of available insurance coverage? We conclude that the UIM claimant has the burden of showing that the person against whom he or she claims is uninsured or underinsured. If the claimant fails to meet that burden, there is no UIM coverage.

We are not alone in reaching our determination. Courts in almost all states place the burden of demonstrating a lack of applicable insurance on the claimant. Appleman, at 321-23; Alan I. Widiss, *Uninsured and Underinsured Motorist Insurance* § 8.26, at 419-20 (2d ed. 1992); *see, e.g., Home Ins. Co. v. Harwell*, 263 Ark. 884, 885, 568 S.W.2d 17, 18 (1978); *Jordan v. Pacific Auto. Ins. Co.*, 232 Cal. App. 2d 127, 133, 42 Cal. Rptr. 556, 560 (1965); *Hartford Accident & Indem. Co. v. Studebaker*, 139 Ga. App. 386, 388, 228 S.E.2d 322, 324 (1976); *State Farm Mut. Auto. Ins. Co. v. Matlock*, 462 S.W.2d 277, 278 (Tex. 1970). In an earlier case from this court, we implied that the burden of proof of a lack of liability insurance was on the UIM claimant. *Signal Ins. Co. v. Walden*, 10 Wn. App. 350, 354, 517 P.2d 611 (1973) ("[o]ne way to prove the unavailability of liability insurance . . ."), *review denied*, 83 Wn.2d 1013 (1974).

C

 It is often difficult, however, to prove a negative fact, such as the fact that a vehicle is underinsured. Widiss § 8.26, at 424. This is especially true in the case of "phantom" or "hit-and-run" vehicles. The claimant, therefore, can discharge his or her burden either by showing that the tortfeasor against whom he or she is claiming was uninsured or underinsured or by showing that the claimant used "all reasonable efforts" to ascertain the existence of any applicable liability insurance and was unsuccessful in this effort. *Signal*, at 354 (citing *State Farm Mut. Auto. Ins. Co. v. Matlock*, 462 S.W.2d 277 (Tex. 1970)); Appleman § 5087, at 321-23; Widiss § 8.26, at 423-25.

Here, Mello was not able to produce any evidence that the phantom vehicle was underinsured. That will, of course, almost always be the case when a "phantom" or "hit-and-run" vehicle causes an accident, usually because the claimant is unable to learn the identity of the tortfeasor.

Mello did, however, attempt to demonstrate that she made all reasonable efforts to ascertain the identity of the owner or operator of the phantom vehicle, and the insured status of that person or persons. In *Signal*, we found that the claimant had met his burden of showing "all reasonable efforts", when those efforts included showing that "[i]nvestigators employed by both parties ma[king] concerted efforts to locate [the tortfeasor] without success." 10 Wn. App. at 351.

Although the parties cite no other Washington cases that define "all reasonable efforts", Dixie cites instructive cases from other jurisdictions. The most closely analogous factually is *Arceneaux v. Motor Vehicle Cas. Co.*, 341 So. 2d 1287 (La. Ct. App. 1977), where the claimant was injured in an accident caused by a vehicle that fled the scene.[5] A witness who had seen the accident and followed the offending vehicle copied down the license plate number of that vehicle. The

[5]Washington courts often look to Louisiana decisions for guidance in interpreting this state's underinsured motorist statute. *Roller*, 115 Wn.2d at 688 n.6; *Hamilton*, at 729-30.

witness then contacted a police officer and reported the license plate number. The police officer included that license plate number in the accident report, a report that eventually came into the hands of the claimant. The claimant failed, however, to make any effort to learn the identity of the tortfeasor. The Louisiana Court of Appeals held in *Arceneaux* that the claimant had not made a sufficient effort to identify the owner or operator of the offending vehicle, observing that the "plaintiff was possessed with the means to ascertain the identity of the tort feasor" but had failed to do so. *Arceneaux*, at 1291.

Another case with a somewhat similar fact pattern is *Members Mut. Ins. Co. v. Tapp*, 469 S.W.2d 792 (Tex. 1971). In that case, the plaintiff knew the license plate number of the vehicle the alleged tortfeasor was driving and also knew that the police had investigated the accident. The claimant failed, however, to attempt to obtain an address of the offending party even though a check of the accident report would have revealed that information. The Texas Supreme Court concluded that the claimant had failed to use "all reasonable efforts" to determine that the tortfeasor was uninsured and that there was no evidence to show that some simple efforts would not have yielded results. 469 S.W.2d at 793.

*Arceneaux* and *Tapp* are examples of cases where courts found a lack of "reasonable efforts" to determine the identity or the insured status of a "phantom" vehicle. Indeed, in those cases, the claimants made more of an effort to learn the identity and insured status of a tortfeasor than Mello did, yet were found to have failed to satisfy their burden. Mello contends that these cases may be distinguished because the claimants in those cases had some information regarding the identity of the "phantom" vehicle's operator or owner. The point, however, is that those claimants had that information only because they made some minimal effort to obtain it, although it turned out in the end that it was not enough to establish coverage. If Mello had made the same minimal effort to obtain an accident report, she would have been in no better position than those claimants.

Significantly, Mello did not contact Trooper McIvor. Neither did she obtain a copy of the accident report or the name of the eyewitness. Indeed, the trial court found that "[s]he [Mello] made no investigation". The only action Mello took was to hire an attorney to represent her regarding the injuries suffered in the accident.

■ The trial court concluded that Mello fully discharged "her duty of due diligence . . . when she retained an attorney to represent her in the matter". We disagree with the trial court's conclusions. If the simple act of hiring an attorney satisfied the "all reasonable efforts" test, a test which we believe is equivalent to the duty of "due diligence", then a claimant need take no action other than hiring an attorney, wait several years, and then file a UIM claim. This would clearly disturb the concept that UIM coverage is secondary and that liability insurance is primary. Obtaining a copy of the accident report, or some comparable action, is, in our judgment, a bare minimum reasonable effort to ascertain the identity of the "phantom" vehicle, and its insured status. If the accident report contains information regarding the "phantom" vehicle, the claimant should be obligated to follow up on that information, to the extent feasible. Merely hiring an attorney does not, in our judgment, discharge the claimant's burden to use all reasonable efforts to determine the identity and insured status of the "phantom" vehicle.

The trial court further concluded that the failure of Mello's attorney to perform a proper investigation of the accident was "not attributable to . . . Mello as to the discharge of her duty of due diligence to discover the identity and insured status of the phantom driver". Mello argues that the attorney's conduct is separate from Mello's because she was unaware of the attorney's inactivity. She relies on the Restatement (Second) of Agency § 277 (1958), which provides that a principal is not affected by knowledge that an agent should have acquired, unless the principal has a duty to others that care be exercised in obtaining information.

Again we disagree with the trial court. As we have noted, Mello's action of merely hiring an attorney did not constitute

"all reasonable efforts" to ascertain the identity of a "phantom" driver. Thus, her attorney's inaction did nothing to alter Mello's failure to satisfy her burden. Furthermore, the attorney's failure to exercise reasonable efforts must be considered the client's failure. Here, the trial court found that the attorney conducted no investigation to determine the identity of the "phantom" vehicle. That inaction, in conjunction with Mello's inaction, does not, as a matter of law, constitute all reasonable efforts.

In any case, Mello's reliance on the Restatement (Second) of Agency is not well taken. No Washington court has cited that provision. Furthermore, it is the general rule in Washington that knowledge of an attorney is knowledge of his or her client. *Haller v. Wallis*, 89 Wn.2d 539, 547, 573 P.2d 1302 (1978). The same rule applies to an attorney's failure to obtain knowledge.

## II

We will briefly address the trial court's conclusion that Dixie had a duty, pursuant to *Tank v. State Farm Fire & Cas. Co.*, 105 Wn.2d 381, 715 P.2d 1133 (1986), to investigate the facts of the accident and keep its insured informed of developments, including the identity of the "phantom" vehicle's owner or operator. Our examination of *Tank* reveals no such duty on the part of an insurance company, and we decline to invoke such a duty in this case.

## III

Because Mello failed to establish any UIM coverage, we need not address most of the other issues in this case, including Dixie's contention that, even if Mello met her burden, it proved that there was no phantom vehicle, that the Essien vehicle was insured, and, thus, that there was no uninsured or underinsured vehicle. Furthermore, the nature of the insurance carrier's ability to rebut a claimant's initial showing that he or she made all reasonable efforts to determine whether a vehicle was underinsured need not be addressed here. We also need not address the question of whether Mello's inaction estopped or precluded her from

asserting coverage, or whether Dixie was entitled to a greater offset.

## IV

In conclusion, we hold that the trial court's findings of fact do not support its conclusion of law that Mello made all reasonable efforts to ascertain the identity of the "phantom" vehicle, or the applicable insurance on that vehicle. Thus, she has failed to discharge her burden to show that the person against whom she claimed was underinsured. We need not, indeed we do not, decide here the allocation of the burden of proof regarding the underinsured status of other at-fault tortfeasors.

Reversed.

MORGAN, C.J., and HOUGHTON, J., concur.

Reconsideration denied September 30, 1994.

Review denied at 125 Wn.2d 1025 (1995).