[No. 42326-6-I.    Division One.    April 19, 1999.]

LIBERTY MUTUAL INSURANCE COMPANY, *Respondent*, v. GORDON TRIPP, ET AL., *Appellants*.

*Alan F. Hall*, for appellants.

*Charles C. Huber* and *Robert J. Dzielak* of *Lane Powell Spears Lubersky, L.L.P.* for respondent.

BAKER, J. — Gordon and Diane Tripp filed a personal injury suit against Lowell Allison. The Tripps received personal injury protection (PIP) benefits from their insurance carrier, Liberty Mutual Insurance Company. Although aware of the Tripp v. Allison suit, Liberty Mutual did not participate in the action. The Tripps settled with Allison and Allison's insurance carrier, Allstate, for $35,000, which was $15,000 less than Allison's liability insurance limits of $50,000. In doing so, they completely released Allison and Allstate.

Liberty Mutual filed this declaratory judgment action seeking a ruling that the Tripps had waived their right to claim underinsured motorist (UIM) relief, and a judgment for the amount previously paid under the PIP provisions of the policy. The Tripps counterclaimed for bad faith. Cross motions for summary judgment were filed.

The trial court granted Liberty Mutual's motion. It held that the Tripps' failure to offer Liberty Mutual the opportunity to buy out their claim against Allison resulted in waiver of their UIM benefits. The trial court also granted summary judgment on Liberty Mutual's PIP subrogation claim.

The Tripps appeal, arguing that they complied with the notice requirements set forth in *Hamilton v. Farmers Insurance Co.*,[1] and that Liberty Mutual was guilty of bad faith. We hold that the Tripps did not comply with *Hamilton*.[2] We affirm the PIP aspect of the court's ruling, because we hold that the Tripps had a contractual obligation to Liberty Mutual to protect its subrogation rights. We reverse the UIM aspect of the court's ruling. Liberty Mutual is subject to UIM arbitration to establish the amount of the Tripps' total damages. When the Tripps settled for less than the tortfeasor's policy limits, they compromised Liberty Mutual's potential reimbursement rights, at least in the amount of the $15,000 difference between their settle-

---

[1] 107 Wn.2d 721, 733 P.2d 213 (1987).

[2] 107 Wn.2d 721.

ment and the policy limits.[3] The amount subject to offset in the UIM arbitration should be increased at least by that amount.

# I

Allison failed to stop at a stop sign and struck Gordon Tripp's car. A personal injury action followed. In April 1993, Liberty Mutual wrote the Tripps' counsel, Alan Hall, and informed him that it would be putting the tortfeasor "on notice of our subrogation PIP lien. We represent ourselves in this recovery, and do not require any other representation."

In October 1994, Hall wrote to Liberty Mutual, stating that "We anticipate the third party carrier to tender policy limits. We are forwarding to you copies of all medical records and bills to give you the opportunity to buy this claim pursuant to *Hamilton*." Further, he stated:

> The draft settlement will name Liberty Northwest as a lien holder. Under *Thiringer[ v. American Motors Ins. Co.*, 91 Wn.2d 215, 518 P.2d 191 (1978)], we will look to Liberty Northwest to waive their subrogated interest. Additionally, we will be pursuing an Underinsured Motorist claim under our client's policy. Please contact me once an adjuster has been assigned to this claim.

In July 1995, Liberty Mutual's counsel confirmed that Hall requested that UIM arbitration be delayed. Later, in May of 1996, Liberty Mutual's counsel confirmed that he had been advised that Hall was:

> not going to proceed with the UIM arbitration of this matter at this time. Rather, you are going to proceed first against the underlying tortfeasor. You have indicated you have a trial date in that matter in early 1997 and will keep us appraised of developments therein. Please let me know if this does not conform to your understanding of our discussion.

In May 1996, Hall wrote Liberty Mutual's counsel sug-

---

[3]The record does not reveal whether the tortfeasor had assets beyond the liability insurance limits.

gesting mediation. The next month, Liberty Mutual's counsel wrote to confirm a conversation with Hall. He stated that:

Liberty Mutual is not inclined to mediate this matter at the present time. It is my understanding you will proceed to mediation with the underlying tortfeasor. Should that not effectuate a settlement, you will then proceed to trial against him. Only after resolution of the claims against the tortfeasor do you intend to proceed against the UIM carrier, Liberty Mutual. Please let me know if this does not reflect your understanding of our conversation.

The mediation was not successful. However, on October 23, 1996, almost two years after the purported *"Hamilton"* letter, the Tripps settled their claim against Allison shortly before trial. They received $35,000 "in full accord, satisfaction, and settlement of a disputed claim growing out of bodily injury and emotional distress sustained by GORDON and DIANE TRIPP as a result of alleged acts on or about April 7, 1993[.]" "[I]n consideration of the sum paid" the Tripps:

release[d] and forever discharge[d] the said LOWELL ALLISON, and ALLSTATE INSURANCE COMPANY, their heirs, successors, administrators, agents and assigns from any and all actions, causes of action, liability, claims and demands upon or by reason of any damage, loss, injury or suffering, known and unknown, which has been or may hereafter be sustained by the undersigned in consequence of such action and injury.

The release specifically included "the subrogated claim of any person or company arising out of the incident in question and/or this settlement agreement."

Five days later, Liberty Mutual's counsel wrote to Hall stating that he had been informed of the settlement and his client "is unwilling to waive its lien and expects both of you and your clients to honor its lien."

Thereafter, Hall sent Allison's counsel a copy of the Stipulation and Order of Dismissal and the Release and Settlement. Further, Hall asked that Allison's counsel "return to

me a copy of the Order after it has been signed by the Judge." Liberty Mutual's counsel was copied on this letter. The Stipulation and Order of Dismissal was signed and filed January 1, 1997.

## II

■ As a preliminary matter, the Tripps' bad faith argument is without merit. As the court held in *Allstate Insurance Co. v. Batacan*, "Bad faith exists only when the insurer's position is 'unreasonable, frivolous, or untenable.' "[4] The Tripps have raised no issue of material fact tending to show such conduct by Liberty Mutual.[5]

## PIP

PIP and UIM differ in that there are different public policy considerations underlying them. Historically, "[a] fundamental policy underlying UIM is full compensation for those injured in automobile accidents."[6] UIM is intended to "supplement but not supplant liability insurance."[7] In this regard, PIP is primary insurance, whereas UIM is secondary. Further, UIM is heavily regulated by statute, unlike PIP.[8] Thus, the treatment of Liberty Mutual's subrogation rights is different for the two types of benefits.[9]

■ The present case is remarkably similar to *Metropoli-*

---

[4]89 Wn. App. 260, 268, 948 P.2d 1316 (1997), *review granted*, 135 Wn.2d 1008 (1998).

[5]*See* RCW 48.01.030, WAC 284-30-330.

[6]*Allstate Ins. Co. v. Dejbod*, 63 Wn. App. 278, 281-82, 818 P.2d 608 (1991), citing *Hamilton*, 107 Wn.2d at 727, 731, 735; *Blackburn v. Safeco Ins. Co.*, 115 Wn.2d 82, 100, 794 P.2d 1259 (1990). *See* reinterpretation of UIM public policy in *Greengo v. Public Employees Mutual Insurance Co.*, 135 Wn.2d 799, 808-09, 959 P.2d 657 (1998).

[7]*Dejbod*, 63 Wn. App. at 284.

[8]*See* RCW 48.22.030 (UIM); RCW 48.22.090 (PIP); *Roberts v. Safeco Ins. Co.*, 87 Wn. App. 604, 606, 941 P.2d 668 (1997).

[9]*See Elovich v. Nationwide Ins. Co.*, 104 Wn.2d 543, 555, 707 P.2d 1319 (1985).

*tan Life Insurance Co. v. Ritz,* where the insured settled with and fully released the tortfeasor "without the assistance or advice of the plaintiff insurance company" despite their contractual obligation to reimburse the company from the settlement.[10] In doing so, the court held that Ritz wrongly destroyed its insurer's subrogation rights.[11] Likewise, in *State Farm Mutual Automobile Insurance Co. v. Lou,*[12] the court held that a settlement for less than the tortfeasor's liability policy limits, with an unconditional release, prejudiced the insurer's right of subrogation for PIP payments and entitled the insurer to judgment against the third party beneficiary passenger in its insured's vehicle.

Based on these cases, it is clear that the Tripps wrongly destroyed Liberty Mutual's subrogated PIP interest. Their Liberty Mutual insurance policy provided the following subrogation provision in the PIP coverage:

D. Subrogation. In the event of any payment under this coverage, the company is subrogated to the rights of the person to whom or for whose benefit such payments were made, to the extent of such payments, and such person must execute and deliver instruments and papers and do whatever else is necessary to secure such rights.

E. Reimbursement and Trust Agreement. In the event of any payment to any person under this coverage:

1. the company shall be entitled to the extent of such payment to the proceeds of any settlement . . . and the company shall have a lien to the extent of such payment. . . .

2. such person shall hold in trust for the benefits of the company all rights of recovery which he shall have against such other person or organization because of such bodily injury;

---

[10]70 Wn.2d 317, 319-21, 422 P.2d 780 (1967). *See also State Farm Mut. Auto. Ins. Co. v. Lou,* 36 Wn. App. 838, 840-41, 678 P.2d 339 (1984) ("[S]ubrogation arose both from the insurance contract and in equity.").

[11]*Metropolitan Life,* 70 Wn.2d at 321.

[12]36 Wn. App. 838, 678 P.2d 339 (1984).

3. such person shall do whatever is proper to secure and shall do nothing after loss to prejudice such rights; and

4. such person shall execute and deliver to the company instruments and papers as may be appropriate to secure the rights and obligations of such person and the company established by this provision.

The Tripps had a contractual obligation to reimburse Liberty Mutual for the PIP amounts it paid them.[13] Further, nothing in the correspondence gave the Tripps permission to destroy Liberty Mutual's PIP lien. Thus we affirm the PIP aspect of the trial court ruling.

## UIM

The Tripps had a duty under *Hamilton*[14] to give Liberty Mutual notice of their tentative settlement with Allison, and to provide an opportunity to buy out their claim. The purpose of the *Hamilton* offset requirement is to encourage the insured to give specific notice to the UIM carrier of the proffered settlement in a timely way so that the carrier may consider any remaining liability insurance coverage beyond the settlement offer, reasonably investigate the assets of the tortfeasor beyond the liability limits, and based thereon, make an informed decision whether to pay its insured an amount equal to the offer, thereby stepping into the insured's shoes to recover against the tortfeasor.[15]

The letter the Tripps sent Liberty Mutual did not comply with *Hamilton*, despite the fact that it mentioned the case name. First, the letter was in no way timely—it came almost two years before the actual settlement offer. Second, it did not provide the requisite basis with which Liberty Mutual could analyze whether it wanted to buy out the Tripps' claim. There was no settlement offer outstanding.

---

[13]*See Mahler v. Szucs*, 135 Wn.2d 398, 424, 957 P.2d 632 (1998); *Metropolitan Life*, 70 Wn.2d at 321.

[14]*Hamilton*, 107 Wn.2d at 733.

[15]*Hamilton*, 107 Wn.2d at 734.

Indeed, when a settlement offer was eventually made almost two years later—and quickly accepted without notice to Liberty Mutual—it was far less than policy limits. Under *Hamilton*, the insurance carrier must have a reasonable opportunity to step into the shoes of the insured once an actual settlement offer is made. That did not happen here.

■ Because the Tripps settled for $15,000 less than the liability policy limits, without giving Liberty Mutual notice, they compromised Liberty Mutual's potential right of reimbursement for at least an additional $15,000 and possibly more if the tortfeasor had reachable assets beyond policy limits. However, Liberty Mutual is subject to UIM arbitration because the record does not establish the actual total amount of the Tripps' damages. The amount of the settlement does not set the total amount of such damages. Absent an agreement by the parties, only a trier of fact can make that determination. The Tripps will be entitled to recover their damages established at arbitration, to the extent the damages exceed the offset available to Liberty Mutual. The amount of that offset would ordinarily equal the liability policy limits of the tortfeasor,[16] but here must be increased by $15,000 due to the Tripps' failure to give proper and timely notice to Liberty Mutual. The UIM aspect of the trial court's ruling is reversed.

Under *Olympic Steamship Co. v. Centennial Insurance Co.*,[17] the Tripps are entitled to reasonable attorney fees and costs on appeal proportionately related to the UIM issue.

Affirmed in part, reversed in part.

KENNEDY, C.J., and BECKER, J., concur.

---

[16]*Farmers Ins. Co. v. Lautenbach*, 93 Wn. App. 671, 676, 963 P.2d 965 (1998); *see also Elovich*, 104 Wn.2d at 550.

[17]117 Wn.2d 37, 51-53, 811 P.2d 673 (1991).

Reconsideration denied June 1, 1999.

Review granted at 139 Wn.2d 1014 (2000).