25 P.3d 997 (2001)
144 Wash.2d 1
LIBERTY MUTUAL INSURANCE COMPANY, Petitioner,
v.
Gordon TRIPP and Jane Doe Tripp, husband and wife, and the marital community comprised thereof, Respondents.
No. 68362-0.
Supreme Court of Washington, En Banc.
Argued May 23, 2000.
Decided June 28, 2001.
*998 Lane Powell, Spears, Lubersky, Charles C. Huber, Alison Lynn Yearsley, Seattle, for Petitioner.
Alan F. Hall, Edmonds, Maltman, Reed, North, Ahrens & Malnati, Michael T. Schein, Seattle, for Respondents.
Harbaugh & Bloom, Gary Neil Bloom, Debra Leigh Stephens, Bryan Patrick Harnetiaux, Spokane, Amicus Curiae on Behalf of Washington State Trial Lawyers Assoc.
*999 ALEXANDER, C.J.
Gordon Tripp was involved in an automobile accident. He later agreed to accept a payment from the insurer of the person who caused the accident as full settlement of his claim against the tortfeasor. He did not, however, notify his insurer, Liberty Mutual Insurance Company (Liberty), before entering into the settlement agreement as he was required to do by a provision in his insurance contract. Liberty thereafter filed a declaratory judgment action against Tripp and his wife claiming that, because the Tripps did not notify Liberty of the settlement, they waived their right to recover underinsured motorist benefits from Liberty and were obligated to reimburse Liberty for the medical expense benefits they had previously received. In a counterclaim, the Tripps asserted that Liberty had acted in bad faith. Both parties moved for summary judgment, and the trial court granted Liberty's motion. On appeal, the Court of Appeals reversed the trial court's determination that the Tripps were not entitled to underinsured motorist coverage under their insurance policy with Liberty, but affirmed the trial court's ruling that Liberty was entitled to reimbursement for the medical benefits it had paid to the Tripps and that the Tripps' bad faith claim was without merit. It also concluded that the Tripps were entitled to attorney fees proportionally related to the underinsured motorist (UIM) issue. We granted Liberty's petition for review as well as the Tripps' cross-petition for review of the trial court's denial of its motion for summary judgment. We affirm the Court of Appeals in part, agreeing with it that "[t]he UIM aspect of the trial court's ruling" should be reversed, that the trial court properly dismissed the Tripps' bad faith claim, and that remand is necessary to determine the effect, if any, of the Tripps' failure to notify Liberty of the settlement it made with the at-fault driver. Liberty Mut. Ins. Co. v. Tripp, 95 Wash.App. 245, 253, 974 P.2d 899 (1999). We reverse the Court of Appeals in part, concluding that it erred in holding, on the record before it, that the Tripps should reimburse Liberty for medical expenses Liberty paid to the Tripps. We also reverse the Court of Appeals' determination that the Tripps should be awarded attorney fees.

I. FACTS
At all times relevant to this appeal, Gordon and Diane Tripp were insured by Liberty. The Tripps' policy included a UIM endorsement, under which Liberty agreed to compensate the Tripps for up to $100,000 of "compensatory damages which [the Tripps were] legally entitled to recover from the owner or operator of an `underinsured motor vehicle' because of: `bodily injury' sustained by [the Tripps] and caused by an accident." Clerk's Papers (CP) at 94. The policy also provided for personal injury protection (PIP), under which Liberty agreed to pay certain medical benefits to the Tripps in the event they were injured in an automobile accident. The PIP endorsement provided, additionally, that Liberty would have a right of reimbursement from any judgment or settlement the Tripps received from a tortfeasor to the extent of the PIP benefits it had paid to the Tripps. Finally, the policy provided that Liberty was subrogated to the Tripps' rights to collect damages from a tortfeasor to the extent of the PIP benefits it had paid, and that the Tripps would do nothing to prejudice Liberty's rights to obtain recovery from the tortfeasor.
In April 1993, Gordon Tripp was involved in an automobile accident. Liberty Mutual paid Tripp $4,599.12 in PIP benefits. Ultimately, the Tripps filed a suit for damages in Snohomish County Superior Court against Lowell Allison, the individual who allegedly caused the accident. The Tripps' attorney notified Liberty of the commencement of the suit against Allison. Liberty responded to the notification as follows: "We represent ourselves in this recovery, and do not require any other representation." CP at 41. On October 6, 1994, the Tripps' attorney wrote to Liberty, stating that he expected Allison's insurance carrier to "tender policy limits" of $50,000. CP at 43. He also stated that he was "forwarding to [Liberty] copies of all medical records and bills to give [Liberty] the opportunity to buy [the Tripps'] claim pursuant to Hamilton." CP at 43. Finally, he noted that "[t]he draft settlement will *1000 name [Liberty] as a lien holder," and that he expected Liberty "to waive their subrogated interest" in the event the parties settled. CP at 43.
The Tripps' attorney thereafter sought arbitration of the Tripps' UIM claim against Liberty. Although Liberty did engage in some discovery, arbitration was postponed to allow the action against Allison to proceed. The Tripps' attorney agreed to keep Liberty "appraised of developments" regarding the litigation against Allison. CP at 50. The attorney then requested mediation of the UIM claim along with the claim against Allison. Liberty indicated that it would not agree to mediate the Tripps' UIM claim against it prior to a resolution of the Tripps' suit against Allison. The Tripps and Allison were unable to settle the lawsuit and the case was scheduled for trial on October 14, 1996.
On the first day of trial, "as they were walking into the courtroom," the Tripps and Allison agreed to settle the lawsuit for a $35,000 payment from Allison's insurer, Allstate Insurance Company. Suppl. Br. of Gordon and Diane Tripp at 5-6. A few days later, without advising Liberty of the settlement, the Tripps signed a document agreeing to "release and forever discharge" Allison and Allstate and expressly agreeing to hold them harmless against all claims, "including the subrogated claim of any person or company." CP at 68-69. Five days after the Tripps signed the release, Allison's counsel contacted counsel for Liberty to request that Liberty waive its claim for PIP reimbursement. Only then did Liberty learn that the Tripps and Allison had agreed to a settlement with Allison. Liberty refused to release its claim for PIP reimbursement. Two days after the conversation between Allison's counsel and Liberty's counsel, the Tripps' counsel forwarded to Liberty's counsel a copy of the "Release and Settlement" and a copy of a proposed "Stipulation and Order of Dismissal." CP at 65. The order of dismissal was entered in January 1997.
Liberty then filed a complaint against the Tripps in Snohomish County Superior Court for a "Declaration of Injunctive Relief and Damages." CP at 124. Asserting that the Tripps destroyed its "UIM subrogation rights" and failed to protect its PIP claim, Liberty sought damages in the amount of the PIP payments that it had made, a declaration that the Tripps had waived any right to claim any UIM benefits, and an injunction prohibiting the Tripps from claiming such benefits. In their answer, the Tripps denied that they failed to give Liberty notice of their settlement with Allison on the day the settlement was reached. They also asserted nine affirmative defenses and contended in a counterclaim that Liberty had acted in bad faith.
Liberty moved for summary judgment, contending that the Tripps waived their right to UIM benefits because they did not notify Liberty of the settlement they reached with Allison and, in addition, were obligated to reimburse it for the PIP benefits it had paid them because the Tripps released Liberty's subrogation claim against the tortfeasor. The Tripps responded with their own summary judgment motion, contending that Liberty's claims were unfounded, that Liberty acted in bad faith, and that the Tripps were entitled to an award of attorney fees. The Superior Court entered summary judgment in favor of Liberty, granting it all of the relief it requested. The Tripps appealed to Division One of the Court of Appeals, contending that the Superior Court erred in granting Liberty's motion for summary judgment and in denying their counter-motion for summary judgment.[1]
The Court of Appeals affirmed the Superior Court on the PIP reimbursement issue but reversed it on the UIM issue. In regard to the latter issue, it held that although the Tripps "compromised Liberty Mutual's potential right of reimbursement for at least an additional $15,000 and possibly more if the tortfeasor had reachable assets beyond policy limits," the extent of Liberty's damages could not be ascertained from the record before it. Liberty Mut., 95 Wash.App. at 253, 974 P.2d 899. It, therefore, remanded the case for UIM arbitration, at which the Tripps *1001 will be entitled to recover their damages established at arbitration, to the extent the damages exceed the offset available to Liberty Mutual. The amount of that offset would ordinarily equal the liability policy limits of the tortfeasor, but here must be increased by $15,000 due to the Tripps' failure to give proper and timely notice to Liberty Mutual.
Liberty Mut., 95 Wash.App. at 253, 974 P.2d 899 (footnote omitted). In addition, it awarded the Tripps reasonable attorney fees and costs on appeal, proportionate to the UIM issue. Liberty Mut., 95 Wash.App. at 253, 974 P.2d 899 (citing Olympic S.S. Co. v. Centennial Ins. Co., 117 Wash.2d 37, 51-53, 811 P.2d 673 (1991)). The Court of Appeals also concluded that the Tripps' bad faith argument was without merit. Liberty Mut., 95 Wash.App. at 250, 974 P.2d 899.
Liberty petitioned this court for review, asserting that the Court of Appeals erred in reversing the trial court on the UIM issue and in awarding attorney fees to the Tripps. The Tripps cross-petitioned for review, contending that the trial court should have been reversed in every respect. We granted review of all of the issues raised by both parties.

II. STANDARD OF REVIEW
We are asked to review the Superior Court's grant of Liberty's motion for summary judgment, as well as its denial of the Tripps' summary judgment motion. When an appeal arises out of an order granting summary judgment, we engage in the same inquiry as the trial court. Johnson v. Farmers Ins. Co., 117 Wash.2d 558, 565, 817 P.2d 841 (1991). Summary judgment is proper only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." CR 56(c). "All facts and reasonable inferences are considered in the light most favorable to the nonmoving party, and all questions of law are reviewed de novo." Mountain Park Homeowners Ass'n v. Tydings, 125 Wash.2d 337, 341, 883 P.2d 1383 (1994) (citations omitted).

III. LIBERTY'S APPEAL

A. UIM Benefits
Liberty contends that the Tripps, as UIM insureds, had a duty to give it notice of the tentative settlement they made with the alleged tortfeasor, Allison, and that their failure to do so destroyed their UIM claim against Liberty. Liberty contends that the Tripps' duty to notify it of the settlement arose both from case law and from language in the policy at issue. Suppl. Br. of Pet'r Liberty Mutual at 3, 8. The Tripps contend that they were not obliged to give Liberty notice of the settlement because Liberty had "all of the information available to it to protect its interests." Suppl. Br. of Gordon and Diane Tripp at 11. They also claim that Liberty was not prejudiced by any failure on their part to give notice. Id. at 15-16. We discuss each of these contentions in turn.
1. Did the Tripps have a common law duty to notify Liberty of their settlement?
Liberty claims that, under our decision in Hamilton v. Farmers Insurance Co., 107 Wash.2d 721, 733 P.2d 213 (1987), UIM insureds have a duty to give their "UIM carrier notice of ... tentative settlement" with the tortfeasor and that the failure to do so should "constitute a waiver or destruction of their UIM claim." Suppl. Br. of Pet'r Liberty Mutal at 2; Pet. for Review at 14. In Hamilton, we determined that "[t]he underinsurer can succeed to the rights of its insured against the tortfeasor by (1) paying the underinsurance benefits prior to release of the tortfeasor and (2) substituting a payment to the insured in an amount equal to the tentative settlement." Hamilton, 107 Wash.2d at 734, 733 P.2d 213. We went on in Hamilton to set forth an extensive quote from an opinion of the Minnesota Supreme Court in Schmidt v. Clothier, 338 N.W.2d 256, 263 (Minn.1983). The quoted language included the following: "`the underinsurer is entitled to notice of the tentative settlement and an opportunity to protect those potential rights [of reimbursement].'" Hamilton, 107 Wash.2d at 733, 733 P.2d 213 (quoting Schmidt, 338 N.W.2d at 263). Notwithstanding our reference to the Minnesota court's *1002 decision, there is nothing in the Hamilton opinion that can be construed as a holding by this Court that UIM insureds always have a duty to notify their UIM insurers that they have reached a settlement with the alleged tortfeasor.[2] It is apparent that we referred to the Minnesota case primarily as support for our holding that the UIM insurer (1) could substitute its payment to the insured in an amount equal to the tentative settlement, and (2) will have a subrogation right against the tortfeasor only if it has paid UIM benefits before the tortfeasor was released. On the other hand, our opinion in Hamilton is not inconsistent with the view that UIM insureds are bound to give such notice as may be required by provisions in their policy of insurance.
2. Did the Tripps have a contractual duty to notify Liberty of the settlement?
Our conclusion that our decision in Hamilton did not impose a duty on insureds to notify their insurer of a settlement with the tortfeasor does not resolve the question of whether such a duty existed here. To fully resolve that issue, we must also look at the language of the insurance policy that the Tripps purchased from Liberty. According to the underinsured motorist endorsement in the policy, the Tripps had the "ADDITIONAL DUT[Y]" to:
Promptly notify [Liberty] of a tentative settlement between the "insured" and the insurer of the "underinsured motor vehicle" and allow [Liberty] a reasonable time to advance payment to that "insured" in an amount equal to the tentative settlement to preserve our rights against the insurer, owner or operator of such "underinsured motor vehicle."
CP at 96.
This policy language must be viewed in light of the principle that UIM insurers cannot diminish the statutorily mandated UIM coverage through language in the insurance policy. Britton v. Safeco Ins. Co., 104 Wash.2d 518, 531, 707 P.2d 125 (1985). We must determine, therefore, if the provision requiring the insured to "promptly notify" the insurer of a "tentative settlement" can be said to diminish the UIM coverage that Liberty was obliged to provide to the Tripps. When determining the validity of a contractual duty imposed in the UIM provisions, we must ask whether the imposition of the duty violates (1) the language of the UIM statute, RCW 48.22.030-.040, or (2) the statute's declared public policy. Greengo v. Pub. Employees Mut. Ins. Co., 135 Wash.2d 799, 806, 959 P.2d 657 (1998).
In resolving the first question, we are to determine whether the notice provision "conflicts with the statute," not whether the statute expressly allows the provision. Greengo, 135 Wash.2d at 808, 959 P.2d 657. It is readily apparent to us that the statute does not prohibit an insurer from requiring the insured to give it notice of a tentative settlement. We also believe it significant that RCW 48.22.040(3) expressly allows UIM insurers a right of reimbursement when their insureds obtain a recovery from a third party. As noted above, we recognized in Hamilton that this right includes the right to substitute payment to the insured in the amount of a proposed settlement and subsequently to pursue a recovery against the third party tortfeasor. Hamilton, 107 Wash.2d at 735, 733 P.2d 213. In our view, the buy-out right we recognized in Hamilton would be substantially compromised if the UIM insurer did not receive notification from its insured of the insured's agreement to settle with the alleged tortfeasor. It is reasonable to assume, therefore, that the Legislature anticipated that insurers would require their insureds to give notice of a tentative settlement. That being the case, we are satisfied that the UIM statute does not prohibit the notice of settlement clause at issue.
Whether the notice of settlement provision in the UIM endorsement violates the public policy underlying the UIM statute is a *1003 closer question. "[T]he public policy underlying UIM is creation of a second layer of floating protection for the insured." Greengo, 135 Wash.2d at 810, 959 P.2d 657; Elovich v. Nationwide Ins. Co., 104 Wash.2d 543, 550, 707 P.2d 1319 (1985). In recognition of that public policy, we have held that so-called "consent to settle" provisions are invalid in the UIM context because these clauses, which exclude UIM coverage if the insured settles without the insurer's written consent, deny insureds this second layer of protection. Elovich, 104 Wash.2d at 553, 707 P.2d 1319. Similarly, "family member exclusion" clauses have been invalidated because they deny coverage based on the class of the victim rather than factors related to the insurer's risk. Tissell v. Liberty Mut. Ins. Co., 115 Wash.2d 107, 114, 795 P.2d 126 (1990). In our judgment, a notice of settlement provision may be distinguished from the aforementioned provisions that we have invalidated. A notice of settlement clause, unlike a consent to settle provision, does not interfere with the insured's settlement negotiations with a tortfeasor. Neither does it inhibit the insured from entering any settlement he or she can negotiate with an alleged tortfeasor. A notice of settlement provision also has no relation to the class of victim. See Tissell, 115 Wash.2d at 113, 795 P.2d 126. In fact, unless breached, a notice of settlement provision has no effect on an insured.
In sum, we are satisfied that the notice of settlement clause in the Tripps' policy with Liberty does not offend the language or policy of the UIM statute. It is, therefore, valid.
3. Did the Tripps fail to give Liberty adequate notice of their settlement?
Having concluded that the Tripps had a duty under the provisions of their insurance policy to give Liberty notice of their settlement with Allison, the next question becomes this: did the Tripps fulfill that duty? Although the policy in question is not specific as to how and when notice must be given, referring simply to the insured's obligation to "promptly notify" Liberty of a "tentative settlement" and allow it a "reasonable time to advance payment to that `insured' in an amount equal to the tentative settlement," we believe it is readily apparent that notice was lacking here. CP at 96. We reach that determination because it is sensible to conclude that the notice contemplated by the provision is notice that is sufficient to give the UIM carrier time to make an informed decision about whether it will pay the insured or simply acquiesce in the insured's settlement, thereby extinguishing the carrier's subrogation right. Undeniably, the Tripps did not notify Liberty of the settlement they made at the Snohomish County courthouse with Allison and Allison's insurer before accepting payment and signing the "Release and Settlement."
Notwithstanding their failure to give Liberty notice of the agreement they reached with Allison, the Tripps argue that:
Liberty had all of the information available to it to protect its interests in this matter. It had full discovery of [the Tripps'] damages, including two medical exams. It knew of the litigation against Allison, Allison's liability insurance limits, the trial date and the negotiations with Allison.
Suppl. Br. of Gordon and Diane Tripp at 11. In that regard, they contend that Liberty had "continuing" and "actual" notice of the tentative settlement because its counsel knew of the Tripps' claim against Allison, and Liberty received the October 6, 1994, letter from the Tripps' counsel which made reference to Liberty's "opportunity to buy [the Tripps' claim] pursuant to Hamilton." CP at 43. This argument fails. Although Liberty was aware of the Tripps' suit against Allison, it did not have the information that it was entitled to receive under its insurance contract with the Tripps: "Prompt[] notif[ication]... of a tentative settlement between the `insured' and the insurer of the `underinsured motor vehicle'" that "allow[s Liberty] a reasonable time to advance payment to that `insured' in an amount equal to the tentative settlement." CP at 96. The fact that Liberty received a letter in October 1994 which mentioned Hamilton cannot be said to be notice of a settlement which took place two years later. While the Tripps' counsel observed that Liberty could have had a representative at the trial between the Tripps and Allison in order to monitor the case and *1004 thereby protect its own interests, its failure to do so does not, in our view, excuse the Tripps obligation to comply with the notice provisions in their insurance policy.
4. What is the proper remedy for the Tripps' failure to give notice of settlement?
The knottiest question before us has to do with the remedy that is available to Liberty for the Tripps' failure to give the notice required by the insurance contract. Liberty contends that the Tripps should be precluded from seeking any UIM benefits because "[n]o other remedy truly protects the UIM carrier's subrogation rights" by giving insureds adequate incentive to notify their insurers of settlements. Suppl. Br. of Pet'r Liberty Mutual at 3. The Tripps suggest that Liberty was not prejudiced by the Tripps' failure to disclose the settlement and, consequently, their UIM coverage should not be affected. Suppl. Br. of Gordon and Diane Tripp at 11. As noted above, the Court of Appeals concluded that the Tripps would be entitled to UIM benefits as determined at arbitration, less a $15,000 offset to Liberty. Liberty Mut., 95 Wash.App. at 253, 974 P.2d 899. Based on the record before us now, we cannot say that either of these positions hits the mark exactly and maintains a proper balance between the public policy underlying the UIM statute and the reimbursement rights of the insurer that we recognized in Hamilton and which are protected by the notice of settlement provision in the Tripps' policy with Liberty.
In determining the proper remedy, we are guided by our belief that a notice of settlement provision is somewhat akin to cooperation clauses that are commonly found in liability policies. An insured's breach of a cooperation clause releases the insurer from its responsibilities only "if the insurer was actually prejudiced by the insured's breach." Tran v. State Farm Fire & Cas. Co., 136 Wash.2d 214, 228, 961 P.2d 358 (1998). We believe that the insured's compliance with a requirement that it give notice of a tentative settlement with an alleged tortfeasor is similar to the insured's obligation to cooperate with the insurer. That is so because both requirements, the giving of notice and cooperation, are acts entirely within the control of the insured. Furthermore, the requirement that notice of settlement be given to the insurer, like the requirement to cooperate, does not prejudice the insured's rights under the policy or reduce the insured's recovery.
We believe, therefore, that while failure to give notice of settlement is a breach of the policy, it gives rise to a remedy only if the insurer is prejudiced by the lack of notice. Applying this rationale to the instant case, we conclude that the Tripps' failure to give Liberty notice of its settlement with Allison does not release Liberty from providing UIM coverage to the Tripps (assuming the Tripps' damages trigger UIM coverage) unless and to the extent Liberty can show that it suffered prejudice as a consequence of the failure to receive notice of the settlement. Although we acknowledge that we held that the insurer in Tran properly denied coverage to Tran based on Tran's failure to cooperate with the insurer, we find that remedy is ill suited to remedy the prejudice caused by the Tripps' failure to give notice here. We say that because a breach of the cooperation clause of the policy, like we saw in Tran, entirely prejudices an insurer's "ability to determine coverage." Tran, 136 Wash.2d at 229, 961 P.2d 358. Here, at least on the record before us, the same cannot be said.
In sum, we conclude that an insured's failure to give its insurer notice of a tentative settlement with a tortfeasor will not reduce a UIM carrier's obligation to pay UIM benefits to its insured unless the insurer can show that it was prejudiced, and then only to the extent it was prejudiced, by the insured's actions. While we recognize that UIM insureds should not be allowed to breach a valid notice of settlement clause without consequence, the "floating layer" of coverage must still be provided. Allowing a violation of the notice of settlement clause to automatically preclude UIM coverage could afford a UIM insurer a windfall and would be inconsistent with the requirement that insureds be provided with that "second layer of floating protection." Greengo, 135 Wash.2d at 810, 959 P.2d 657. Furthermore, such a remedy would go well beyond the right it is designed *1005 to protect. In Hamilton, we merely recognized the UIM insurers' rights to step into their insureds' shoes and obtain damages from the tortfeasor. Hamilton, 107 Wash.2d at 734, 733 P.2d 213. When an insurer avails itself of this opportunity, it can never recover more than the tortfeasor is able to pay, with any recovery over the amount of the substituted settlement payment applied first to any uncompensated damages of the injured insured. Id. Consequently, Liberty could realize a windfall if it were allowed to completely deny the Tripps any UIM coverage. Liberty, therefore, should be permitted to escape paying UIM benefits only in amounts equal to the actual prejudice that it suffered on account of the Tripps' breach of the notice provision in the insurance contract.
Recognizing that Liberty can be relieved of its obligation to provide UIM coverage only to the extent it can prove that it was prejudiced by the settlement between the Tripps and Allison's insurer, the next question becomes this: has Liberty been prejudiced by the settlement? As mentioned above, Liberty argues that it has suffered prejudice while the Tripps argue it has not.
Prejudice is an issue of fact and can seldom be established as a matter of law. Tran, 136 Wash.2d at 228, 961 P.2d 358. The insurer has the burden of proving that it has suffered prejudice from its insured's breach. Oregon Auto. Ins. Co. v. Salzberg, 85 Wash.2d 372, 376, 535 P.2d 816 (1975). It is incumbent, therefore, on Liberty to show "actual prejudice."[3]
As indicated above, we disagree with the Court of Appeals' determination that the record supports a conclusion that Liberty has been prejudiced in the amount of $15,000 by the Tripps' settlement with Allison for $35,000. An insured may settle for less than the tortfeasor's policy limits and still obtain the benefits of underinsured motorist coverage. Elovich, 104 Wash.2d at 552, 707 P.2d 1319. But it is the insured, not the insurer, who absorbs the loss, if any, when settling for less than policy limits. This is so because "the underinsurer always is allowed to credit the full amount of the tortfeasor's liability coverage against the insured's damages." Hamilton, 107 Wash.2d at 728, 733 P.2d 213.
Based on the record before us, we conclude that the degree to which Liberty has been prejudiced, if at all, cannot be determined until the amount of the Tripps' total damages has been determined. Until their damages have been ascertained, we do not know if Liberty, as the UIM carrier, has any UIM liability to the Tripps.[4] We cannot, in short, determine at this time whether and to what extent Liberty was prejudiced by the Tripps' failure to notify Liberty of its settlement with Allison's insurer. After an arbitrator determines the total amount of Tripps' damages, the issue of whether and to what extent Liberty was prejudiced by the settlement with Allison can be determined by the trial court in the instant declaratory action.
The burden of proving the degree to which Liberty was prejudiced, if at all, resides with Liberty. Liberty does not meet its burden to show it was prejudiced by the Tripps' settlement with Allison simply by establishing the amount of its PIP and UIM subrogation claims. It would still have to show that it was prejudiced by the Tripps' breach of their duty to give Liberty notice of the tentative settlement agreement with Allison. In that regard, Liberty would have to prove that if it had been given notice of the settlement agreement with Allison for $35,000, it would have protected its PIP and *1006 UIM subrogation interests by purchasing the Tripps' claim. This may not be an easy burden for Liberty to meet because it would have to establish that it was willing to pay the amount of the settlement to its insureds and step into the insureds' shoes.[5]
In sum, without knowing the amount of the Tripps' total damages and ultimately whether Liberty has any UIM liability, we cannot determine whether Liberty has suffered any prejudice as a consequence of the settlement between the Tripps and Allison's insurer. We, therefore, remand this matter to the trial court to determine, after the arbitrator has fixed the amount of the Tripps' damages, whether and to what extent Liberty has suffered prejudice as a consequence of the Tripps' failure to give it notice of its tentative settlement with Allison.

B. Attorney Fees
Liberty contends that the Court of Appeals erred in awarding the Tripps attorney fees "proportionately related to the UIM issue." Liberty Mut., 95 Wash.App. at 253, 974 P.2d 899. It argues that it would be inequitable to award fees to the Tripps "when they are responsible for creating this situation by destroying Liberty's subrogation rights." Pet. for Review at 19. The Tripps respond that they are entitled to an award of attorney fees because Liberty compelled them to defend this action in order to recover UIM benefits to which they were entitled.
In Olympic Steamship, this Court held that when "the conduct of the insurer imposes upon the insured the cost of compelling the insurer to honor its commitment" under an insurance contract, the insured can recover those costs. Olympic S.S Co. v. Centennial Ins. Co., 117 Wash.2d 37, 53, 811 P.2d 673 (1991). In later cases, however, we have made it clear that "[w]e cannot authorize the imposition of attorney fees ... when an insured has undisputedly failed to comply with express coverage terms, and the noncompliance may extinguish the insurer's liability under the policy." Pub. Util. Dist. No. 1 v. Int'l Ins. Co., 124 Wash.2d 789, 815, 881 P.2d 1020 (1994).
Clearly, if Liberty establishes that it was prejudiced by the Tripps' failure to comply with the notice of settlement provision, the Tripps would not be entitled to an award of attorney fees. We believe the result should be the same even if Liberty fails to establish prejudice because it was the Tripps' failure to comply with express terms of the insurance contract, not Liberty's conduct, that precipitated this action. The Tripps should, therefore, not be awarded fees and the Court of Appeals erred in concluding otherwise.

IV. THE TRIPPS' APPEAL

A. Claim for PIP Reimbursement
The Tripps argue that the Court of Appeals erred in holding that they are required to reimburse Liberty from their settlement with the tortfeasor for the PIP amounts paid to them. The Tripps' policy with Liberty provided them with up to $10,000 in "personal injury protection benefits for medical expenses." CP at 88. However, as Liberty points out, their PIP endorsement expressly provides for subrogation and reimbursement with respect to PIP benefits paid by Liberty. Specifically, the Tripps' policy states:
In the event of any payment to any person under this coverage ... the company shall be entitled to the extent of such payment to the proceeds of any settlement or judgment that may result from the exercise of any rights of recovery ... and the company shall have a lien to the extent of such payment[.]
CP at 90. Liberty successfully argued at the appellate court that, because of this clause, "[t]he Tripps had a contractual obligation to reimburse Liberty Mutual for the PIP amounts it paid them." Liberty Mut., 95 Wash.App. at 252, 974 P.2d 899.
The Tripps and amicus, the Washington State Trial Lawyers Association Foundation, argue that the Court of Appeals erred in reaching the conclusion it did because "[a]n *1007 insurer may not ... enforce a PIP reimbursement provision against its insured until it has been determined that the insured has made a full recovery." Br. of Amicus Curiae WSTLA Foundation at 17. We agree and hold that, notwithstanding the contractual language cited above, a PIP insured cannot be required to reimburse the insurer unless and until the insured is fully compensated. Case law on this point has been clear since at least 1978:
The general rule is that, while an insurer is entitled to be reimbursed to the extent that its insured recovers payment for the same loss from a tort-feasor responsible for the damage, it can recover only the excess which the insured has received from the wrongdoer, remaining after the insured is fully compensated for his loss.
Thiringer v. Am. Motors Ins. Co., 91 Wash.2d 215, 219, 588 P.2d 191 (1978); accord Brown v. Snohomish County Physicians Corp., 120 Wash.2d 747, 754-55, 845 P.2d 334 (1993).
In a recent case, Mahler v. Szucs, 135 Wash.2d 398, 418-19, 957 P.2d 632, 916 P.2d 305 (1998), we interpreted a PIP subrogation clause that was almost identical to the language in the Tripps' policy. Citing Mahler, Liberty argues that "a PIP carrier is entitled to subrogation from the proceeds of its insured's recovery from the tortfeasor." Suppl. Br. of Pet'r Liberty Mutual at 17. This argument overlooks the fact that in Mahler we made it clear that a UIM insurer "was not entitled to any recovery of its PIP payments until its insureds had been made whole." Mahler, 135 Wash.2d at 424, 957 P.2d 632. Moreover, in Mahler we considered only the insurer's claim for reimbursement because "[n]either [of the insureds] argue[d] they would not be fully compensated were they to reimburse State Farm from the settlement proceeds." Mahler, 135 Wash.2d at 421 n. 11, 957 P.2d 632. In Mahler, we were not required to consider the issue of an undercompensated insured as in the present case. Here, the Tripps contend that they were not fully compensated by the settlement. If that assertion is correct, Liberty is not entitled to any reimbursement.
Liberty argues that settlement for less than the tortfeasor's limits of liability raises a presumption that the insureds have been made whole. Br. in Answer to Amicus Curiae WSTLA Foundation at 10. Liberty relies on Peterson v. Safeco Insurance Co., 95 Wash.App. 254, 260, 976 P.2d 632 (1999), which, in turn, relied on a decision of the Court of Appeals in Allstate Insurance Co. v. Batacan, 89 Wash.App. 260, 266, 948 P.2d 1316 (1997), for the proposition that an insured who settles is impliedly fully compensated. However, this court overruled Batacan. Allstate Ins. Co. v. Batacan, 139 Wash.2d 443, 986 P.2d 823 (1999). Furthermore, there is no other precedent for the position that settlement for less than the tortfeasor's policy limits somehow raises a presumption of full compensation or otherwise prejudices the insured's PIP benefits. The Court of Appeals opinions in Batacan and Peterson also only involve PIP, without a broader UIM claim. Finally, Liberty would not be entitled to PIP reimbursement if the Tripps had recovered Allison's policy limits and all of his reachable personal assets, but were still not fully compensated.
We hold that the Court of Appeals erred in affirming the "PIP aspect of the trial court ruling." Liberty Mut., 95 Wash.App. at 252, 974 P.2d 899. Liberty, in our judgment, is not entitled to be reimbursed for its PIP payments until the Tripps receive full compensation. Because the Tripps total damages have not yet been determined, we do not know if they have been fully compensated. That issue may be determined by the trial court only after the arbitrator has determined the Tripps' damages.

B. Bad Faith
The Tripps contend, finally, that the "trial court and [Court of Appeals] erred in finding that no bad faith was committed on the part of Liberty Mutual." Tripps' Cross Pet. for Review at 3-4. They argue that, at a minimum, the question of whether or not Liberty acted in bad faith in denying them UIM benefits and in seeking reimbursement of PIP benefits is a factual question that can be determined only by the finder of fact at trial.
*1008 Pursuant to RCW 48.01.030, an insurer is to "be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters." An insurer acts in bad faith only when the position it takes is unreasonable, frivolous or untenable. Kirk v. Mount Airy Ins. Co., 134 Wash.2d 558, 951 P.2d 1124 (1998).
Although we agree with the Tripps that the question of whether an insurer unreasonably denies coverage is generally an issue of fact,[6] no material issue of fact has been raised here that shows that Liberty acted in bad faith. Essentially, the Tripps contend that Liberty "set the Tripps up" by (1) advising them that it would "represent" itself, (2) not availing itself of "numerous" opportunities to "buy out" the Tripps' claim against Allison, (3) failing to "monitor the trial date and have someone present at the critical first day of trial of Tripp v. Allison," (4) failing to mediate what it would pay to "buy out" the Tripps' claim against Allison, and (5) suing the Tripps for allegedly not protecting their subrogation interests. CP at 33-35 (Mem. of Auth., and Att'ys Aff. in Resp. to Pl.'s Mo. for Summ. J. and in Supp. of Defs' Cross Mot. for Summ. J. (Bad Faith) and Att'y Fees).
Even after viewing the Tripps' submissions in the light most favorable to them, as we must, we can easily conclude that the trial court and Court of Appeals correctly concluded that the Tripps' bad faith argument lacks merit. For reasons we have set forth above, we agree with Liberty that it was not unreasonable, frivolous or untenable for it to proceed as it did. Its act of bringing a declaratory judgment action to determine whether the Tripps were precluded from asserting a UIM claim was, therefore, not a breach of its duty to act in good faith.

V. CONCLUSION
We conclude that the Court of Appeals properly held that the Tripps' bad faith claim was without merit and that it correctly reversed "[t]he UIM aspect of the trial court's ruling." Liberty Mut., 95 Wash.App. at 253, 974 P.2d 899. We also conclude that it properly remanded for a UIM arbitration to determine the Tripps' amount of total damages. Following that determination, the trial court can determine in the underlying action whether Liberty has in fact suffered any prejudice as a consequence of the Tripps' failure to notify it of the settlement they made with Allison. We reverse the Court of Appeals insofar as it concluded, on the record before it, that the Tripps must reimburse Liberty for PIP payments they received. We also reverse its award of attorney fees to the Tripps.
SMITH, MADSEN, BRIDGE, JJ., and GUY, J. Pro Tem, concur.
SANDERS, J. (concurring in part, dissenting in part)
I substantially agree with the majority's disposition of the case subject, however, to two significant exceptions: (1) I would hold, as a matter of law, an insurer who sleeps on its right to buy out a claim cannot later show it has been prejudiced by a settlement of that claim; and (2), given that the insureds have prevailed on a coverage issue, I would hold the insureds are entitled to recover reasonable attorney fees pursuant to Olympic Steamship Co. v. Centennial Insurance Co., 117 Wash.2d 37, 52-53, 811 P.2d 673 (1991).
I. Breach of Tentative Settlement Clause
I agree with the majority that the insureds may have breached the tentative settlement clause found in the underinsured (UIM) coverage section of their policy. This clause provides, under the heading "ADDITIONAL DUTIES":
A person seeking Underinsured Motorists Coverage must also:
. . . .
3. Promptly notify us of a tentative settlement between the "insured" and the insurer of the "underinsured motor vehicle" and allow us a reasonable time to advance payment to that "insured" in an amount equal to the tentative settlement to preserve our rights *1009 against the insurer, owner or operator of such "underinsured motor vehicle."
Clerk's Papers at 96.
Although the facts indicate the insureds and the tortfeasor arrived at a settlement on the courthouse steps wherein the UIM insureds executed a release of all claims against the tortfeasor in consideration of a $35,000 payment without prior notice to the UIM insurer of the terms and conditions of the tentative settlement, the facts also demonstrate the UIM insurer was specifically aware of the pending litigation between its insureds and the tortfeasor, yet did nothing. Liberty Mutual made no effort to buy out the insureds' claim against the tortfeasor for the tortfeasor's liability limits of $50,000, or for any other amount. Accordingly we do not have the situation where the insureds declined an offer from their own insurance company made pursuant to Hamilton v. Farmers Insurance Co., 107 Wash.2d 721, 733 P.2d 213 (1987) to buy out the insureds' right to proceed against the tortfeasor.
Given these facts, the majority holds that although the insureds technically breached the tentative settlement clause of their policy that would not in itself defeat coverage. I assume that this would at most entitle the insurer to offset sums otherwise due to its insureds under UIM coverage to compensate it for the prejudice, if any, incurred as a result of the provision's breach. My fundamental disagreement is with the proposition that prejudice is theoretically possible absent a refusal of a UIM insured to sell its cause of action against the tortfeasor for policy limits.
Although Hamilton says the underinsurer "may secure its subrogation rights by substituting a payment to the insured in an amount equal to the settlement offer," in the context of Hamilton the settlement offer was payment of the full amount of the liability limits in exchange for a release of all claims. Hamilton, 107 Wash.2d at 734, 733 P.2d 213. The UIM insurer (Farmers) however instructed its insured not to settle on that basis because the insured would prejudice the ability of Farmers to recover from the tortfeasor's assets in excess of the liability limits. The holding of Hamilton was that the clause upon which Farmers relied, granting it the right to veto such a settlement, was void as against public policy. Later in the Hamilton opinion the court said one option available to Farmers would have been to "secure its subrogation rights by substituting a payment to the insured in an amount equal to the settlement offer." Id.
However in Hamilton there was no settlement offer on the table which the UIM insurer was willing to accept because, if for no other reason, the offer was contingent upon a release of all claims. Rather the opportunity that Hamilton affords the insurer is the opportunity to buy out the cause of action against the tortfeasor, an opportunity which exists whether or not there is an offer on the table from the tortfeasor to settle the case for any particular amount of money.
The difference between this case and Hamilton is here the UIM insurer had the opportunity to offer to buy out Tripps's claim against the tortfeasor for the tortfeasor's limits of liability. That the tortfeasor had never made an offer to that effect doesn't matter. As related above, this does not make any difference because the only reason a UIM insurer would buy out such a claim would be to preserve its rights to proceed against the tortfeasor to recover a collectible judgment against the tortfeasor sufficiently in excess of tortfeasor liability limits to repay itself all or a portion of its UIM payments to its insureds.
Here, however, Liberty Mutual could have offered to buy out Tripps's claim against the tortfeasor for liability limits of $50,000 but did not. That the Tripps and the tortfeasor ultimately settled for $35,000 makes no difference in terms of prejudice under Hamilton because "the underinsurer always is allowed to credit the full amount of the tortfeasor's liability coverage against the insured's damages," Hamilton, 107 Wash.2d at 728, 733 P.2d 213, before it has any responsibility to start paying UIM benefits in any event.
To put it another way, if Liberty Mutual did not offer to buy this claim for $50,000 either because (1) it believed the claim was worth less than $50,000 or (2) it believed there were no available assets in excess of *1010 $50,000 to be collected directly from the tortfeasor, then there would be no reason for Liberty Mutual to buy out the claim from its insureds for some amount under $50,000.
To illustrate: Let us suppose Liberty Mutual was given ample notice, opportunity, and actually elected to buy out the claim from its insureds against the tortfeasor for $35,000. This would mean Liberty Mutual would potentially have to take the case to trial, and obtain a collectible judgment of at least $35,000 plus all of its attorney fees to simply break even. But even if the trial court actually awarded judgment for $50,000 Liberty Mutual would not come out ahead because according to Hamilton, "[a]ny recovery over the amount of the substituted settlement payment must be applied first to any uncompensated damages of the injured insured. Only after the insured's damages are fully compensated can the underinsurer retain any recovery." Hamilton, 107 Wash.2d at 734, 733 P.2d 213.
As the majority concedes, the only way it would make sense for the UIM insurer to buy out the claim, therefore, would be the expectation that it would recover a collectible judgment against the tortfeasor for an amount substantially enough in excess of liability limits of $50,000 so it could start repaying itself UIM payments made to its insured (after fully recovering its additional litigation costs). Majority at 1005-06. Only in such a situation would the UIM insurer begin to experience any "prejudice" from the insured's unauthorized settlement and release of all claims. However there would be no possible prejudice to the UIM insurer if it declined to buy out the claim from its insured up to the limits of liability.
I therefore think logic requires if Liberty Mutual wants to claim prejudice it must prove it offered to buy out its insureds' claim against the tortfeasor and that offer was rejected by its insureds. That did not happen here. Liberty never offered to buy out its insureds' claim against the tortfeasor for any sum. Moreover I can conceive of no rational reason why the insureds would reject such an offer to pay tortfeasor liability limits, if made. Recall, by accepting such an offer the insureds could still obtain from their UIM carrier up to UIM policy limits above the buy out, here an additional $100,000 over the tortfeasor's liability limits. Moreover if the insurer recovers sums in excess of that from the tortfeasor then, under Hamilton, it must turn those moneys over to its insureds as well.
Therefore I would affirm the Court of Appeals on the UIM issue except to the extent the Court of Appeals apparently set off $65,000 against the right of UIM recovery rather than the $50,000 limits of the underlying liability policy. That was the error I thought we granted review to correct.
II. Olympic Steamship Attorney Fees
Quite aside from the aforementioned, I disagree with the majority that these insureds are not entitled to recover reasonable attorney fees against their insurer notwithstanding this case represents a denial of UIM coverage reversed on appeal.
When "the conduct of the insurer imposes upon the insured the cost of compelling the insurer to honor its commitment" under an insurance contract, the insured is allowed to recover those costs. Olympic S.S. Co., 117 Wash.2d at 53, 811 P.2d 673. Here Liberty Mutual facially denied UIM coverage, a decision reversed by both the Court of Appeals and our majority because "Liberty could realize a windfall if it was allowed to completely deny the Tripps any UIM coverage." Majority at 1005. Thus the majority holds the insurer wrongfully denied all UIM coverage causing the Tripps to incur those costs necessary to compel Liberty to honor its commitment. Olympic Steamship dictates the Tripps are entitled under these circumstances to recover an award of reasonable attorney fees sufficient to compensate them for their trouble.
The majority defends its decision by citing Public Utility District No. 1 v. International Insurance Co., 124 Wash.2d 789, 815, 881 P.2d 1020 (1994) (PUD 1), claiming attorney fees aren't available when an insured fails to comply with express coverage terms. Majority at 1006. I disagree.
PUD 1 was not a UIM case. Moreover the gravamen of the attorney fees holding *1011 was that the insureds settled their claims "without the consent of their insurers." PUD 1, 124 Wash.2d at 815, 881 P.2d 1020. Such a basis would be invalid in the UIM context because a consent to settle clause in a UIM policy is void as against public policy. Elovich v. Nationwide Ins. Co., 104 Wash.2d 543, 553, 707 P.2d 1319 (1985).
Hamilton put Liberty Mutual on notice UIM coverage cannot be contractually diminished by subrogation. Hamilton, 107 Wash.2d at 731, 733 P.2d 213. The majority cites this rationale to support its decision on the UIM claim but then fails to honor it by awarding attorney fees. Majority at 1005, 1006-07.
Liberty therefore was charged with the knowledge that it would be allowed to credit the full amount of the tortfeasor's liability coverage against the insureds' damages, Hamilton, 107 Wash.2d at 728, 733 P.2d 213, and we have held the Tripps's settlement was not a valid basis to deny all coverage.[1] Although Liberty is entitled to full credit of the $50,000 liability limit offset under Hamilton, no theory arising under the facts of this case sustained by the majority justifies complete denial of UIM coverage.
The majority claims the Tripps's failure to comply with the contract precipitated this action, not Liberty's conduct. Majority at 1006. This is simply not true. It is Liberty Mutual's conduct, not that of the Tripps, that is being reversed by today's decision. Because of its wrongful actions Liberty must now be compelled to compensate its insureds. The majority gives with one hand and takes away with the other: upholding Hamilton by reversing Liberty's denial of all UIM coverage but refusing to honor Olympic Steamship by awarding the attorney fees that reversal requires.
I dissent.
JOHNSON, J., and KATO, J.Pro Tem., concur.
NOTES
[1] The trial court did not explicitly deny the Tripps' motion for summary judgment. The Tripps presented the issue to the Court of Appeals, however, apparently concluding that denial of their motion could be implied from the trial court's grant of summary judgment to Liberty.
[2] In American Economy Insurance Co. v. Lyford, 94 Wash.App. 347, 354, 971 P.2d 964 (1999), the Court of Appeals held that a UIM insured was not required, under Hamilton, to give written notification to his insurer of a pending settlement when the UIM carrier has actual knowledge of all the information it needed to protect its right of reimbursement.
[3] Liberty cites foreign cases to support its argument that the Tripps' failure to protect Liberty's reimbursement rights should result in an automatic waiver of UIM coverage. Br. of Resp't at 11. Those cases, however, involve a consent to settle provision, which, as we have noted, has no application to UIM coverage. Furthermore, we require a finding of prejudice before vitiating coverage even for a violation of a consent to settle clause in a liability policy. See Tran, 136 Wash.2d at 228, 961 P.2d 358.
[4] Clearly, if the Tripps' damages are determined by the arbitrator to be less than or equal to $50,000, the Tripps would not be entitled to any UIM award because Allison could not be deemed to have been the operator of an "underinsured motor vehicle." CP at 94. Liberty would not, in this circumstance, be able to show that it suffered any prejudice as to its UIM liability, but may still be able to show that it was prejudiced by the Tripps' release of its PIP subrogation claim.
[5] In making such a decision, the insurer would have to consider a number of factors, which may include, for example, the costs if litigation ensues, together with the risk that the tortfeasor might be insolvent, and any difficult liability issues.
[6] Wolf v. League Gen. Ins. Co., 85 Wash.App. 113, 122, 931 P.2d 184 (1997).
[1] There was no consent to settle provision in the insurance contract, and in any event the Tripps had the right to settle their claims against the tortfeasor with or without the consent of Liberty Mutual.